# The United States District Court

for the

Western District of North Carolina

**PAULA GREENE PAINTER**, both individually and derivatively on behalf of J&P Enterprises of the Carolinas, Inc.

        Plaintiff,

v.

**JEFFERY LAMAR GREENE, SALLY M. GREENE, HARRISON GREENE, SAMUEL CARTER GREENE, SIMEON ROSS GREENE, DAN HUNT,** as the Personal Representative of The Estate of Lamar Greene, **and BRENDA PRESSLEY**, C.P.A., Defendants

Case No. _____3:24-cv-990_____

PLAINTIFF'S VERIFIED COMPLAINT and REQUEST FOR APPOINTMENT OF A RECEIVER AND IMMEDIATE INJUNCTIVE RELIEF

**JURY TRIAL DEMANDED**

NOW COMES Paula Greene Painter, both individually and derivatively on behalf of J&P Enterprises of the Carolinas, Inc. filing this her Verified Complaint and Request for Appointment of a Receiver and Injunctive Relief, respectfully showing this Honorable Court the following:

## SUMMARY STATEMENT OF CLAIMS ASSERTED

1.      Plaintiff asserts these claims individually and derivatively, on behalf of J&P Enterprises of the Carolinas, Inc. ("J&P"). Plaintiff is a (24%) minority (i.e., 'powerless'). The business and property interests of both Plaintiff and J&P have been damaged by each RICO Defendant's respective violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

§1962 *et seq*. and the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C.G.S. § 75D-1 *et seq*, (in particular, subparts § 75D-4(a) (1), (2), and (3).

The pattern of racketeering includes the following listed *predicate acts*:

A.    18 U.S.C.  §1956 (relating to the laundering of monetary instruments)

B.    18 U.S.C. §1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity),

C.    18 U.S.C. § 1341 (mail fraud),

D.    18 U.S.C. § 1343 (wire fraud),

E.    26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and

F.    26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

Plaintiff also sues (a) Defendant Jeffery Greene, a "controlling minority shareholder" and (b) Dan Hunt, who is legally charged with a duty to 'manage and control' J&P through his position as the Personal Representative ("PR") of Lamar Greene's estate, the owner of a 52% (majority) share of J&P's ownership interests.  Each said Defendant has breached their respective fiduciary duties to Plaintiff, a "powerless" minority shareholder of J&P--a closely held ('family') North Carolina corporation.

## THE STRUCTURE AND ORGANIZATION OF PLAINTIFF'S COMPLAINT

2.    This case is factually complex.   There are multiple-overlapping fraudulent "schemes," based upon overlapping and concurrent events—which precludes the use of a single factual chronology.   Therefore, the factual basis for the Defendants' Racketeering Schemes is grouped together into three (3) Parts:

a.  Part One: The first group of facts is focused on a long-developing RICO Scheme by Defendants to acquire all the assets from Lamar Greene's probate estate. (see footnote no. 1). This scheme is currently ongoing. Because immediate injunctive relief is requested relating to the potential imminent disposition of J&P, the largest asset in Lamar Greene's estate, the factual basis for claims arising from this Scheme are stated first.

b.  Part Two: The second group of facts consists of several successive racketeering schemes perpetrated by RICO Defendants (i.e., "Persons") against each member of Jeffery Greene's original family, his father's surviving wife, and against J&P's employer-matching IRA program.

c.  Part Three: The third group of facts concerns RICO Defendants actions towards J&P Enterprises of the Carolinas, Inc., Plaintiff, and (possibly) J&P's 'other' shareholder— whom is yet to be formally determined by the Probate Court in Pickens County, South Carolina. This "scheme" is the most economically impactful of all of the schemes against Plaintiff, individually and on J&P.

3.  The (largest and longest continuing) "Part Three" scheme was only recently discovered through the voluminous financial records of J&P dating back to (approximately) 2005, which provide a detailed record of *thousands* of financial transactions. These records document and establish a pattern of racketeering through an "Enterprise" and a *massive* level of fraud against J&P, Plaintiff and others. They also reveal a (total) *alter ego* control and exploitation of J&P [1] by Jeffery Greene and other RICO Defendants operating under his direction.

---

[1] J&P was (and continues to be) used by RICO Defendants to a primary instrumentality of racketeering activities by RICO Defendants

4.     The full extent of this "scheme" is not yet known but can and will be known through Plaintiff's ongoing investigation and analysis and reasonable discovery in this case.

5.     In this Complaint, the general background facts (i.e., which relate to all claims) are presented, followed by chronologically arranged facts relevant to each of the other (known) "Racketeering Scheme(s)".  For convenience and accessibility, each scheme is described and organized separately according to a Table of Contents including (hyperlinked) subtitles.

6.     Every effort has been made to state the facts concisely, while still providing the specificity required by Fed. R. Civ. Proc. 9(b) and the Supreme Court's decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) and American Dental Association v. CIGNA Corp., 605 F. 3d 1283 (2010).


**Table of Contents**

SUMMARY STATEMENT OF CLAIMS ASSERTED ............................................................................1

THE STRUCTURE AND ORGANIZATION OF PLAINTIFF'S COMPLAINT .............................................2

GENERAL DESCRIPTION OF CASE .......................................................................................................6

PARTIES ...................................................................................................................................................9

    14.    *Plaintiff*.............................................................................................................................9

    15.    *Defendants*.....................................................................................................................9

JURISDICTION AND VENUE ................................................................................................................10

PLAINTIFF'S STANDING AND AUTHORITY TO ASSERT BOTH DIRECT AND DERIVATIVE CLAIMS ...................11

    THE DEMAND REQUIREMENT UNDER N.C.G.S. §55-7-42—IRREPARABLE HARM exception to the 90-DAY NOTICE REQUIREMENT ........................................................................................................................12

BACKGROUND FACTS (APPLICABLE TO ALL CLAIMS) ...............................................................17

PART ONE:  THE LAMAR GREENE'S ESTATE SCHEME (I.E., INCLUDING MAJORITY SHAREHOLDER'S RIGHTS OVER J&P ENTERPRISES OF THE CAROLINAS, INC. ("J&P")) ...........................................21

    JEFFERY GREENE'S DECEPTION regarding LAMAR GREENE'S ESTATE .............................................22

    DAN HUNT'S NEGLIGENCE ..................................................................................................................23

    JEFFERY AND SALLY'S CONTINUING EFFORTS TO TAKE ALL OF LAMAR GREENE'S ESTATE ASSETS—TO the detriment OF JULEENE GREENE...............................................................................................................28

    RECENT EVENTS .................................................................................................................................31

PART TWO: "TARGETED" RICO SCHEMES (AGAINST JEFFERY GREENE'S ORIGINAL FAMILY MEMBERS).......36

*Plaintiff's first Discovery: Jeffery Greene's Alter Ego Use of J&P as the main Instrumentality of a RICO Enterprise—including documentary evidence of multiple predicate acts establishing a clear "pattern of racketeering.*...................................................................................................................*36*

THE MARGIE GREENE SCHEME ...................................................................................................38
    *Specific "Predicate" Acts-examples* ........................................................................................*41*
THE "32 SAND DOLLAR LLC"—HILTON HEAD SCHEME (RICO DEFENDANTS JEFFERY AND SALLY GREENE) .................43
    *Specific "predicate" acts—examples*........................................................................................*48*
THE JULEENE GREENE SCHEME ...................................................................................................48
THE SCHEME TO EXPLOIT J&P'S IRA MATCHING CONTRIBUTIONS FOR EMPLOYEES...................................54

PART THREE:        THE J&P ENTERPRISES SCHEME(S)...........................................................................57

THE FIRST J&P ENTERPRISES SCHEME TO/FOR ENRICH/SUPPORT OF EACH MEMBER OF THE JEFFERY GREENE FAMILY......58
    *Specific (Typical) Examples of J&P Payments to and/or for the Benefit Of Each Member of the Jeffery Greene Family*...............................................................................................................*59*
THE SECOND J&P ENTERPRISES SCHEME—I.E., THE PROPERTY ACQUISITION SCHEME .............................70

JEFFERY GREENE'S USE OF J&P ENTERPRISES OF THE CAROLINAS, INC. AS HIS *ALTER EGO* .....................73

FEDERAL CLAIMS..................................................................................................................75

COUNT 1: (AGAINST ALL DEFENDANTS) ......................................................................................75

RICO 18 U.S.C. § 1962(C)-- CONDUCTING AND PARTICIPATING IN THE AFFAIRS OF AN ENTERPRISE THROUGH A COMMON PATTERN OF RACKETEERING ACTIVITY BASED UPON THE PREDICATE ACTS OF EMBEZZLEMENT, 18 U.S. CODE §1341 (MAIL FRAUD), 18 U.S. CODE §1343 (WIRE FRAUD), 18 U.S. CODE §§1956 AND 1957 (I.E., MONEY LAUNDERING), 26 U.S.C. §7201 (I.E., ATTEMPT TO EVADE OR DEFEAT TAX) AND 26 U.S.C. §7206 (INTENT TO COMMIT TAX FRAUD OR TO PREPARE AND SUBMIT FALSE TAX STATEMENTS), AS PREDICATE ACTS....................................................75
    *The RICO Enterprise*..............................................................................................................*76*

COUNT 2 (AGAINST ALL DEFENDANTS) ......................................................................................83

RICO-18 U.S.C. § 1962(D) (AGAINST ALL DEFENDANTS) CONSPIRING TO VIOLATE 18 U.S.C. §1962(C). ...................83

COUNT 3 (AGAINST JEFFERY GREENE, SALLY GREENE, HARRISON GREENE, SAMUEL GREENE AND SIMEON GREENE)...........................................................................................................................86

18 U.S.C. § 1962(A) – ACQUIRING AN INTEREST IN AN ENTERPRISE WITH RACKETEERING INCOME ...............86

COUNT 4 (AGAINST JEFFERY GREENE, SALLY GREENE, HARRISON GREENE, SAMUEL GREENE AND SIMEON GREENE)...........................................................................................................................87

18 U.S.C. § 1962(B) – ACQUIRING AN INTEREST IN AN ENTERPRISE THROUGH RACKETEERING ACTIVITY .......................87

STATE LAW CLAIMS...............................................................................................................89

COUNT 5: RICO (NORTH CAROLINA) CHAPTER 75D-4(A)(2) - CONDUCTING OR PARTICIPATING IN, DIRECTLY OR INDIRECTLY, ANY ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY .............89

COUNT 6: RICO (NORTH CAROLINA) CHAPTER 75D-4(A)(3) - CONSPIRING WITH ANOTHER OR ATTEMPTING TO VIOLATE ANY OF THE PROVISIONS OF SUBDIVISION CHAPTER 75D-4(A) (1) OR (2)................................90

COUNT 7: RICO (NORTH CAROLINA) CHAPTER 75D-4(A)(1) -- ENGAGING IN A PATTERN OF RACKETEERING ACTIVITY OR, THROUGH A PATTERN OF RACKETEERING ACTIVITIES OR THROUGH PROCEEDS DERIVED THEREFROM, ACQUIR[ING] OR MAINTAIN[ING], DIRECTLY OR INDIRECTLY, ANY INTEREST IN OR CONTROL OF ANY ENTERPRISE, REAL PROPERTY, OR PERSONAL PROPERTY OF ANY NATURE, INCLUDING MONEY ..91

COUNT 9-BREACH OF FIDUCIARY DUTY ......................................................................................94

COUNT 10--REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF, INCLUDING THE APPOINTMENT OF A RECEIVER PURSUANT TO N.C. GEN. STAT. § 75D-8 .................................................................................96

5

PRAYER FOR RELIEF ................................................................................................................97

# General Description of Case

7.     Lamar Greene, the founder, CEO and President of J&P Enterprises of the Carolinas, Inc., (i.e., "the company" and/or "J&P") was hospitalized in connection with his last illness on January 22, 2009.  Throughout Lamar's extended hospitalization, and continuing after his ensuing death on October 9, 2009, RICO Defendant Jeff Greene, Lamar's son, assumed complete operational and fiscal control over the family business.

8.     J&P is a closely held corporation, owned by:

   a.  Jeffery Greene-- owns 24% of J&P's stock.  He has also served as the company's sole Officer, Director, and Manager at all relevant times. He has at all relevant times, been the "controlling shareholder" of J&P.

   b.  Dan Hunt—Lamar's PR, holds (52%) majority control over J&P's voting shares, but he has knowingly and intentionally chosen to completely abdicate his own rights and responsibilities of management and control in favor of Jeffery Greene's *unsupervised,* unaccountable, total and comprehensive control over J&P.

   c.  Plaintiff, Paula Painter, owns 24% of J&P's stock. She is a 'powerless' minority shareholder.

9.     When Jeffery assumed control of the 'family' business (J&P) on January 23, 2009, he immediately began treating it as his *alter ego,* breaching his fiduciary duties to Plaintiff, a non-controlling minority shareholder, and using J&P as an instrumentality for money laundering, tax fraud, and illegal "racketeering," and to further advance the goals and purposes of an unlawful RICO "Enterprise", to wit: to perpetrate a series of fraudulent (and ongoing) schemes against each

and every member of Jeffery Greene's original family, his father's estate, J&P, the federal government and many others for the personal enrichment of each member of the Jeffery Greene family.

10.     Using (i.e., converting and/or embezzling) J&P and its accounts as his own (personal) property, Jeffery Greene caused J&P to expend its money (directly) for:

a.      his family's living expenses (including mortgage payments, utilities, taxes, food, entertainment, travel, automobiles, boats, recreational vehicles, insurance, accounting services, thousands of credit card purchases, gas, food, purchases, entertainment, etc.,

b.      the purchase, repair, upkeep and taxes on several family-owned rental properties,

c.      contributions to 'employer'-matched IRA plans for each of the non-employee members of Jeffery Greene's immediate family, including Sally M. Greene, Harrison Greene, Samuel Carter Greene, Simeon Ross Greene,

d.      real estate investments titled in the names of himself and his wife, Sally Greene, and/or in the name(s) of other corporate entities exclusively owned and controlled by Jeffery and Sally Greene,

e.      expensive vacations, travel and entertainment for Jeffery Greene's family,

f.      personal and family country club and private golf memberships, including other ticket and member purchases with such memberships (i.e., Clemson University football VIP ticket-blocks, parking, IPTAY membership and privileges and benefits, etc.),

g.      *many* other purchases and expenses for the exclusive consumption, use, enrichment, enjoyment and benefit of each member of the Jeffery Greene family.

11.     Jeffery Greene also used J&P's revenues and profits to perpetrate a series of fraudulent RICO schemes against every member of Lamar Greene's *original* family (including his deceased

7

father's currently pending estate), detailed below—again, for the personal enrichment of Jeff Greene, Sally Greene and their three (3) adult sons, Harrison Greene, Samuel Carter Greene, and Simeon Ross Greene.

12.     Acting over a period of more than fifteen (15+) years in and through a series of related and continuous "racketeering acts" (i.e., more specifically defined and described below), and through an active RICO Enterprise composed of Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene, Simeon Greene, Brenda Pressley (a CPA and tax preparer) and Dan Hunt (the above-referenced PR of Lamar Greene's estate), Defendants Jeff and Sally Greene led and directed an association-in-fact Enterprise with the goal and objective of converting and wrongfully appropriating/acquiring:

a.     valuable real estate assets owned by Jeffery Greene's mother, Margie Greene,

b.     valuable real estate assets owned by Lamar Greene's vulnerable surviving wife, Juleene Greene, whom Lamar also designated as the residuary beneficiary under his Last Will and Testament,

c.     *all* the assets of Lamar Greene's estate

d.     *all* the assets in (and/or claimed to be in) Lamar Greene's Estate, and

e.     *all* the assets, revenues, profits, and corporate opportunities of J&P (i.e., summarily described above)

f.     *all* of Plaintiff Paula Painter's shareholder rights and all her rightful share of corporate profits each year from January 2009 to the present,

proximately causing substantial damages to Plaintiff's and J&P's respective business and/or property interests.

13.    In April 2024, after 15 years of receiving no truthful information from Jeffery Greene, Plaintiff succeeded in obtaining the entire record of all of J&P's financial transactions under Jeffery's sole management and control.[2]  The records of Jeffery's self-dealing were extensive, detailed and informative.  The records clearly-document the RICO Defendants' blatant and complex racketeering activities/schemes, which started on January 23, 2009.

       The forensic analysis of those records is ongoing.

# PARTIES

## 14.   Plaintiff

       Paula Greene Painter ("Plaintiff") is a resident of Cobb County, Georgia. She brings this suit individually and derivatively on behalf of J&P Enterprises of the Carolinas, Inc., a North Carolina Corporation, headquartered in Gastonia, North Carolina.

## 15.   Defendants

   a. Jeffery Lamar Greene is a resident of Beaufort County, South Carolina; he serves as the sole Director, Officer, Manager and controlling shareholder of J&P Enterprises of the Carolinas, Inc., located in Gastonia, North Carolina.

   b. Sally M. Greene is a resident of Beaufort County, South Carolina.  She is married to Jeffery Greene, and together, they have three (3) adult sons, identified below.

   c. Harrison Greene is a resident of Fulton County, Georgia.  He is an adult child of Jeffery and Sally Greene.

---

[2] Through this detailed information, Plaintiff discovered that J&P's tax returns since 2009 are a complete and total, fraudulent sham.

9

Case 3:24-cv-00990-FDW-SCR    Document 1    Filed 11/11/24    Page 9 of 102

d. Samuel Carter Greene is a resident of Alachua County, Florida. He is an adult child of Jeffery and Sally Greene.

e. Simeon Carter Greene is a resident of Georgetown County, South Carolina. He is an adult child of Jeffery and Sally Greene.

f. Daniel E. ("Dan") Hunt is an attorney who resides and maintains a law practice in Easley, Pickens County, South Carolina.

g. Brenda Pressley is a certified public accountant who resides and maintains an accounting and tax preparation firm in Davidson, Mecklenburg County, North Carolina.

16. Each of the above-identified Defendants is a culpable RICO "Person(s)" under 18 U.S.C. 1962(c) and are separate and distinct from the "Enterprise" in which he/she/they participated. Each said Defendant functions as an individual, and each has his/her own respective interests, activities, goals, objectives and pursuits, but also as (a) participant(s) with specific and distinct roles and responsibilities in conducting the affairs of the association-in-fact "RICO Enterprise" identified and described below, in and through a pattern of racketeering.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction pursuant to 28 U.S.C. § 1138(a) because federal questions are predicated on violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), codified at 18 U.S.C. §§ 1961-1968. The RICO claims are predicated upon violations of 18 U.S.C. §§ 1962(c), 1962(d), 1962(a), and 1962(b) and the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C.G.S. § 75D-1 *et seq*, (in particular, subparts § 75D-4(a) (1), (2), and (3).

18. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as the non-federal question claims arose from the same nucleus of operative facts.

19. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because the events or omissions giving rise to the claims occurred in this judicial district. All the known financial transactions which form the basis of the Claims asserted herein were initiated from the corporate offices of J&P Enterprises of the Carolinas, Inc., a North Carolina corporation, located in Gastonia, North Carolina. The financial transactions each directly affected interstate commerce.

## PLAINTIFF'S STANDING AND AUTHORITY TO ASSERT BOTH DIRECT AND DERIVATIVE CLAIMS

20. J&P Enterprises of the Carolinas, Inc. ("J&P"), a closely held 'family' corporation, has only three (3) shareholders:

    a.   Dan Hunt, the Personal Representative of Lamar Greene's estate, and the controller of a 52% controlling majority share of J&P.

    b.   Jeffery Greene, who owns 24% of J&P's stock, but who qualifies as its "controlling shareholder" by virtue of being the company's sole Director, Officer and manager, at all relevant times.

    c.   Plaintiff, Paula Greene Painter, who owns 24% of J&P's stock. She is "powerless" over the management and direction of the company—completely dependent upon Dan Hunt and Jeffery Greene.

21. Plaintiff has owned 24% of the corporation's stock from the time of the company's formation in 1985 to the present (and throughout all the events and circumstances giving rise to the filing of this Complaint). In accordance with N.C. Gen. Stat. § 55-7-41, Plaintiff shall maintain her ownership interest(s) throughout the litigation of this case.

22. The Plaintiff's individual claims and J&P's claims are based upon the same complex and voluminous record of evidence, much of which has already been assembled by Plaintiff.

23.     Plaintiff is the only identified *non-culpable* stockholder of J&P, and therefore, the *only* shareholder whose interests are completely aligned with the corporation's legitimate interests.

24.     Both of J&P's other stockholders (i.e., RICO Defendants Jeffery Greene and Dan Hunt, respectively), are accused in this Complaint of directly harming the corporation and its shareholders—through (a) Jeffery's conversion and/or embezzlement of the corporation's funds, (b) Jeffery's exploitation of the company as the primary instrumentality for the RICO Defendants' racketeering activities in furtherance of the goals and objectives of the Enterprise (c) Dan Hunt's grossly negligent conduct in the fulfillment of his duties and obligations as the Personal Representative of Lamar Greene's estate.

25.     Plaintiff is well-positioned and qualified under N.C. Gen. Stat. § 55-7-41 to fairly and adequately represent the interests of the corporation in the enforcement of its rights.  In this case, the fiduciary duties owed by Defendants Jeffery Greene and Dan Hunt to Plaintiff, (a "powerless" minority shareholder in a closely held (family) corporation having only 3 shareholders) are the same or substantially like the fiduciary duties they each owe to J&P.

## The Demand Requirement under N.C.G.S. §55-7-42—Irreparable Harm exception to the 90-day notice requirement

26.     Prior to the filing of this Complaint, a written demand has been made upon the corporation pursuant to §55-7-42 (1) to take suitable action; however, Plaintiff will show that irreparable injury to the corporation would result if Plaintiff were required to wait for the expiration of the 90-day waiting period before initiating this suit.

27.     Irreparable injury will result to J&P Enterprises of the Carolinas, Inc. if Plaintiff is required to wait 90-days before filing J&P's derivative claims.

28.     Recent developments (in the probate case) have caused a significant 'escalation' by Defendants Dan Hunt and Jeffery Greene to "cover up" and/or "conceal"

a.  Jeffery's conversion and/or embezzlement of the corporation's funds,

b.  Jeffery's exploitation of the company as the primary instrumentality for the RICO Defendants' racketeering activities in furtherance of the goals and objectives of the Enterprise,

c.  Dan Hunt's gross negligence conduct in the fulfillment of his duties and obligations as the Personal Representative of Lamar Greene's estate, and

d.  The entire record of evidence concerning the racketeering conduct by all RICO Defendants.

29.    The progression of events started in approximately January 2024, when Dan Hunt filed an Amended Complaint in the probate case alleging claims of fraud and *executor de son tort* against Jeffery and Sally Greene. [3]

30.    In April 2024, Plaintiff was able, through her own investigative efforts, to obtain the complete financial record (and files) documenting all of J&P's financial transactions since Jeffery Greene assumed sole control of J&P on January 23, 2009.

31.    Plaintiff then caused subpoenas to be issued (in the probate case matter)--obtaining many (but not all) of RICO Defendants' tax returns, banking accounts, J&P's vendor accounts, and credit card expenditures.  Those records served to reveal and confirm *thousands* of predicate acts by the RICO Defendants.

32.    An early (lay) examination of those records by Plaintiff reveals the basis for a *massive*, ongoing, well-documented RICO claims, a *complete and pervasive* use of J&P by Jeffery Greene as his *alter ego*, and strong evidence that Jeffery Greene and the other RICO Defendants have been (and are currently) perpetrating an extensive fraud upon his father's probate estate.

---

[3] See **Tab 1**.

33.     It has become evident, based upon the above-referenced recent discovery of records, that Jeffery Greene has converted/embezzled tens of millions of dollars from J&P as part of multiple racketeering schemes in furtherance of an ongoing RICO Enterprise—and that most, if not all of that has taken place during Dan Hunt's tenure as the PR of Lamar Greene's estate.

34.     For the past eleven (11) years, RICO Defendant Dan Hunt, the controller of 52% of J&P's outstanding stock, has permitted Jeffery Greene act without any oversight or accountability as J&P's only Director, Officer, and manager.

35.     As soon as Plaintiff obtained the above-described evidence, she provided several summaries along with the entire financial record of J&P's financial transactions under Defendant Jeffery Greene to Dan Hunt, who (after several weeks of hesitation and reluctance to act) was *finally* willing to remove Jeffery Greene and appoint Plaintiff as J&P's sole director.

36.     The expressed purpose of Plaintiff's appointment was to initiate a J&P-funded, comprehensive evaluation of J&P's financial records (and Jeffery's conduct with respect to J&P's financial management)—but *not* to otherwise assume management and control of J&P. It was supposed to be a temporary, limited time/scope appointment.

37.     Dan Hunt signed a Consent Agreement [4] to remove Jeffery as J&P's sole Director and to appoint Plaintiff in Jeffery's place.

38.     However, as soon as Jeffery Greene learned that Dan Hunt had taken steps to investigate Jeffery's wrongdoing, Jeffery hired Douglas Patrick, a life-long friend of Dan Hunt, and everything changed.

39.     Dan Hunt organized a "secret" mediation session (in Douglas Patrick's offices) between Jeffery Greene and Juleene Greene (but expressly excluding Plaintiff).

---

[4] See **Tab 2**

40.     At the 'secret' mediation, and using a hastily-modified version of the original Consent form, Dan Hunt removed Plaintiff as J&P's Director and re-appointed Jeffery (i.e., despite Dan's knowledge of Jeffery's racketeering activities, his *alter ego* use of J&P's funds for the enrichment of himself and everyone in his immediate family, and *multiple* fraudulent schemes)—and thereby deprived Plaintiff of an opportunity to initiate a full forensic investigation (i.e., at J&P's expense) of J&P's financial operations under Jeffery's management and control.

41.     On information and belief, an intense effort was made to persuade Juleene Greene to accept a high-six or low-seven figure amount in exchange for her agreement to 'settle' all her claims in Lamar's estate—including Jeffery's (fraudulent) claim for all of Lamar's J&P stock (i.e., worth exponentially more than the amount(s) offered by Jeffery Greene)

42.     Dan Hunt called the undersigned, weeping, and said, "Bill, we have made a big mistake! Jeff is threatening to 'blow everything up'...we can't take away his control over *his* company!"

43.     RICO Defendants Jeffery Greene, Sally Greene and Dan Hunt, jointly initiated challenges in the probate case to the undersigned's continuing role as Plaintiff's *Pro Hac Vice* attorney—and they sought to exclude Plaintiff from any further involvement in the probate case (even though no such objections were raised prior to the involvement of Douglas Patrick and Austin Watts.

44.     There is a real and **immediate threat** to the continuation/existence of J&P as a viable, profitable business.

45.     Having been presented with Plaintiff's Amended Answer and Counterclaim which clearly identified a 11+ year long 'error' in Dan Hunt's reading and interpretation of the specific bequest in Lamar Hunt's Will (see, the section entitled "Jeffery Greene's Deception regarding Lamar Greene's Estate," below, for a full discussion of the facts), Dan Hunt's weeping statement,

"...Jeff[rey] is threatening to 'blow everything up'..." evidences the existence of a very real, immediate and irreparable threat of harm to J&P and to Plaintiff's business and property interests.

46.     On information and belief, Jeffery Greene has negotiated the sale of J&P's parts business and its main office facility.  He has located a buyer and negotiated terms.

47.     J&P's corporate attorney, Paul Baynard, (who has, at all times, prioritized Jeffery Greene's individual interests over J&P and/or Plaintiff) has adamantly refused to disclose any details of that proposed transaction and/or any of the records of more than $82,000 in attorney's fees charged to J&P in a recent 3-year period of time (for unspecified legal work, purportedly provided to J&P). Mr. Baynard has also stated that J&P has no corporate records at all—such as Articles of Incorporation, Minutes of Meetings, Bylaws, etc. [5]

48.     On the basis of information and belief, the proposed sale of J&P has been scheduled to 'close' as soon as Jeffery obtains Lamar's majority (52%) share of J&P stock from Lamar's estate.

49.     In that foreseeable, imminent event, J&P's certain injuries could never be adequately remedied by an award of monetary damages alone.

50.     There also exists evidence of a (new) conspiracy between Jeffery Greene, Sally Greene, Dan Hunt, Douglas Patrick and Austin Watts to (1) exploit Juleene Greene's current financial stress by forcing a disadvantageous settlement agreement *or* dragging out the probate case even longer, and (2) in so doing, to 'cover' or conceal Dan Hunt's own extensive negligence (and financial liability) as the PR of this inexplicably long (15+ year) probate case.

51.     Without the immediate issuance of injunctive relief, both J&P and Plaintiff will suffer irreparable harm.

---

[5] See **Tab 3**

52.     Under such circumstances it would be impossible to determine the amount of damages resulting to J&P and to J&P's stockholders, including Plaintiff.  J&P's relationships with its customers would be severely damaged, and J&P would certainly suffer irreparable reputational harm.

53.     Jeffery Greene has threatened to "blow everything up," *because* it is now evident (to all parties) (a) that Lamar's specific bequest of J&P Enterprises, Inc. stock to Jeff has been adeemed by extinction <u>and</u> (b) because Jeffery's wrongful scheme to take Lamar's J&P stock and Dan Hunt's extensive record of incompetence and negligence as PR) have now been exposed which, in turn, provides a powerful incentive for the RICO Defendants to *suddenly* negotiate a settlement agreement and close the estate matter (after 15+ years of little to no activity).

54.     Plaintiff respectfully requests a waiver of the 90-day Notice Requirement under N.C.G.S. §55-7-42 for the filing of J&P's derivative claims. This is the only way that J&P and Petitioner's can proceed in their request for immediate equitable relief so as to prevent irreparable harm to their respective business and property interests.

# BACKGROUND FACTS (applicable to all claims)

55.     Lamar Greene formed a Virginia corporation, "J&P Enterprises, Inc, in 1977 for the purpose of pursuing real estate development projects.  Jeffery Greene and Plaintiff  (i.e., See Tab 4a, attached) each, respectively, owned 24 shares (of 100) issued shares and Lamar owned 52.

56.     On August 24, 1979, J&P Enterprises, Inc. obtained a Certificate of Authority to do business in North Carolina. (See footnote 4(d) and **Tab 3**, *supra*.)

57.     In 1979, Lamar and Margie moved their family to South Carolina.  Then, in 1985, Lamar formed J&P Enterprises of the Carolinas, Inc. (a South Carolina corporation) to pursue a full-time business in the textile arena.

58.     There was no connection between J&P Enterprises, Inc. (i.e., the Virginia corporation) and the *South Carolina* corporation Lamar formed in 1985, known as J&P Enterprises of the Carolinas, Inc. ("JPotC," herein)

59.     JPotC was organized with 100 outstanding shares of stock.  Consistent with Lamar's practice, Lamar and Margie owned 52 shares (i.e., held in Lamar's name) and he gave Jeff and Paula, respectively, 24 shares each in that company.

60.     On September 23, 1987, Lamar and Margie were divorced in Cherokee County, South Carolina, but continued to enjoy a mutually supportive and well-connected relationship.

61.     On October 1, 1989, Lamar married his second wife, Juleene Graham.

62.     On January 10, 1992, Lamar executed his Last Will and Testament. [6]   In it, he bequeathed "…all of [his] ownership interests in **J&P Enterprises, Inc.**" (emphasis added) to his son Jeffery Greene.

63.     Eleven (11) months after Lamar signed his Will, (i.e., on December 4, 1992), Lamar established a *North Carolina* corporation using the same as his South Carolina corporation, "J&P Enterprises of the Carolinas, Inc."

64.     On May 19, 1993, [7] Lamar signed an Agreement ("Agreement") providing for the purchase of Paula Greene's 24 shares in "**J&P Enterprises, Inc.**" (i.e., the same entity Lamar specifically bequeathed to Jeffery.)  Lamar also purchased a life insurance policy providing for a death benefit of $330,000, for the purpose of funding that Agreement.

65.     Prior to Lamar's death, that Buy-Sell Agreement-life insurance policy was cashed in, and the insurance policy was thereby cancelled.

---

[6] See **Tab 4**

[7] See **Tab 5**

66.     J&P Enterprises, Inc. was authorized to do business in North Carolina from August 24, 1979 until September 10, 1993, when its Certificate to Do Business in North Carolina was revoked.[8]

67.     A North Carolina Revenue Suspension Order was issued on October 13, 1995[9] (i.e., Notably, three years and ten months years after Lamar signed his Will).

68.     Lamar's Will specified that Juleene Greene, would receive all other property he owned, including the entire residue of his estate.

69.     In September 1992, Margie Greene was diagnosed with Non-Hodgkins Lymphoma. Her treatment plan required surgery, chemotherapy, and radiation, and this had a substantial (and ultimately disabling) effect upon Margie's memory, cognition and ability to focus/concentrate. [10]

70.     On July 1, 1993, the South Carolina corporation (i.e., JPotC) was merged *into* the North Carolina corporation (i.e., "J&P") through an equal share exchange.[11] The North Carolina corporation survived the merger; JPotC's shareholders became the J&P's shareholders, in the same ownership percentages.

71.      At all times after the merger (until he was admitted to the hospital for the treatment of his last illness on January 23, 2009), Lamar served as J&P's President/CEO, as the manager of the company's fiscal and operational activities

72.     In March 2006, J&P filed for Bankruptcy under Chapter Eleven (11) of the United States Bankruptcy Code.

---

[8] It should be noted that this event happened seventeen (17) months after Lamar signed his Will and five (5) months after forming J&P Enterprises of the Carolinas, Inc.

[9] See **Tab 6** (Certificate of Revocation of Authority to do Business in NC)

[10] See **Tab 7** (Revenue Suspension Order)

[11] See **Tab 8** (Articles of Merger)

73. Paul Baynard of the North Carolina law firm, Rayburn, Cooper & Durham, P.A., represented J&P.

74. Approximately eighteen (18) months after filing, J&P submitted a *proposed* Plan of Reorganization[12] under which the Company was proposed to continue to operate with Lamar Greene as President/CEO and Jeff Greene as Vice-President.

75. The Plan indicated that J&P's Board of Directors would be reduced from a 3-person Board, (i.e., consisting of Lamar Greene, Jeffery Greene and Paula Painter) to only a 2-person Board (i.e., excluding Paula), consisting of Lamar and Jeffery.

76. The Plan made no changes with respect to J&P's ownership structure. Each shareholder retained the exact same shares and respective proportions of ownership he/she owned prior to the bankruptcy filing.

77. J&P's proposed Reorganization Plan was filed on December 27, 2006. However, the corporate documentation effectuating the proposed changes (i.e., the reduction of J&P's Board of Directors from a 3-member to a 2-member Board (excluding Paula) was never drafted, properly executed and/or properly filed in North Carolina.

78. After emerging from bankruptcy in 2007, Lamar continued to operate J&P exactly as before, until Lamar was admitted to the critical care unit of a local hospital on January 23, 2009.

79. Lamar Greene was hospitalized in connection with his last illness on or January 22, 2009.

80. On January 23, 2009, Jeffery Greene assumed full control and authority over the fiscal and operational activities of J&P. This provided Jeffery Greene with unlimited access and control over J&P's monetary assets, and he, along with the other RICO Defendants, used Jeffery's new position to perpetrate part or all the racketeering schemes, described below.

---

[12] See **Tab 9**, J&P's Reorganization Plan.

81.     On October 29, 2009, Lamar Greene died.

# Part One: The Lamar Greene's Estate Scheme (i.e., including majority shareholder's rights over J&P Enterprises of the Carolinas, Inc. ("J&P"))

82.     Following Lamar Greene's death on October 29, 2009, Jeffery Greene took it upon himself to "manage" the property left by his father, having a familiarity with many of Lamar Greene's business dealings/interests.

83.     On April 10, 2011, Jeffery Greene filed an Application for Appointment as the Personal Representative ("PR") of Lamar Greene's estate. He also filed a supposed sworn Inventory of Lamar Greene's estate. (By the time of Lamar's death, the business interests specifically bequeathed to Jeff no longer existed and, pursuant to South Carolina law, that bequest had become *adeemed by extinction*). Without disclosing that fact, Jeffery began his (wrongful) attempts to conflate the business entity Lamar owned at the time he signed his Will with the largest asset in Lamar's estate which Lamar owned at the time of his death—J&P.)

84.     In approximately October 2011, Jeff Greene approached Plaintiff Paula Painter, and-- referring to John Lee Elrod, a child fathered by Lamar Greene during (and outside of) Lamar's second marriage to Juleene Greene—said, "I need to get your 'stock'…I need to devalue the stock by splitting and dividing the shares to make them worthless so this child will never receive anything."

85.     Plaintiff vehemently refused Jeff Greene's requests/demands.

86.     On July 27, 2011, Jeffery's Application was denied by the Pickens County, South Carolina probate court ("probate court"), based upon several obvious "conflicts of interest."

87.     On April 10, 2013, Dan Hunt, a highly experienced Probate Attorney with a 45+ year probate practice in Pickens County, South Carolina, was appointed as the "Personal Representative" ("PR") of Lamar Greene's Estate.

88.     As an experienced probate attorney, it was assumed/expected that RICO Defendant Dan Hunt well-understood his duties as the PR of Lamar's estate, which included (1) the duty to manage and control the estate's assets—including the estate's controlling shareholder interest in J&P, (2) the duty to accurately value/appraise J&P, (3) the duty to prepare and file accurate annual tax returns for the estate, (4) the fiduciary duties he owed to Plaintiff, J&P's only non-controlling minority shareholder, (5) the duty to know and understand J&P's business operations and any risks associated therewith and to protect and/or insure those operations against harm or loss during the pendency of the active probate case.

89.     In his Last Will and Testament ("Will")[13], Lamar Greene had made one (1) specific bequest of *"…all of the stock owned at the time of my death in **J&P Enterprises, Inc**…."* to Jeffery Greene. Otherwise, Lamar left the entirety of his property, including the residue of his estate, to Juleene Greene, his (second) surviving wife.

## Jeffery Greene's Deception regarding Lamar Greene's Estate

90.     Having previously given each of his adult children 24% of the stock in J&P Enterprises of the Carolinas, Inc., Lamar made no other expressed additional provisions for either of his adult-children in his Will.

91.     Even though Lamar was actively operating J&P Enterprises, Inc. at the time he signed his Will, in January 1992, the company ceased sometime later. Nineteen months later, North Carolina

---

[13] See **Tab 4** (Lamar's Last Will and Testament)

issued a Certificate of Revocation of the Authority to Transact Business.[14]   Two years after that,

The above-referenced Revenue Suspension Order (see **Tab 7**) was issued.  The company was never

legally reinstated and, *at no time*, has any person or entity ever filed an assumed name certificate

reserving the name "J&P Enterprises, Inc." as a doing business as (d/b/a)name or an assumed name

in North Carolina, South Carolina and/or Virginia.

92.    Jeffery Greene and Plaintiff each, respectively, owned 24% of J&P Enterprises, Inc.'s

stock; Jeffery Greene had actual knowledge that the property specifically bequeathed in Lamar's

Will was adeemed by extinction, but concealed that fact from Dan Hunt—and, at the same time,

falsely led Dan Hunt into believing that Lamar had specifically bequeathed his stock in J&P

Enterprises of the Carolinas, Inc. to Jeffery.

93.    Jeffery Greene falsely represented that J&P Enterprises, Inc. was simply the 'D/B/A' or an

'assumed name' of J&P Enterprises of the Carolinas, Inc., Lamar's most valuable asset.

94.    Concealing his knowledge about J&P Enterprises, Inc., Jeffery misled Dan Hunt into the

erroneous belief that Lamar's specific bequest referred to Lamar Greene's (52%) controlling

interest in J&P Enterprises of the Carolinas, Inc. ("J&P").[15]

## Dan Hunt's Negligence

95.    Dan Hunt never investigated the true facts concerning Lamar Greene's estate—instead

opting to completely rely upon what he was told (and not told) by Jeffery.

---

[14] See **Tab 6** (Certificate of Revocation to do Business in N.C.)
[15] At all relevant times, J&P, a closely held corporation, has been owned by:
    a.  Jeffery Greene—owns 24% of J&P's issued stock.  He has also served the company's sole Officer, Director, and Manager at all relevant times. He has at all relevant times, been the "controlling shareholder" of J&P.
    b.  Plaintiff, Paula Painter, owns 24% of J&P's issued stock, and
    c.  Dan Hunt—as Lamar's PR, holds a (52%) majority controlling interest in J&P's voting shares.

96.     Dan Hunt never questioned why Lamar Greene would exclude one of his children (Plaintiff) and favor his other child (i.e., Jeffery) in such a disproportionate manner, or why Lamar would leave his largest asset to Jeffery Greene and not to his devoted, (i.e., aging, nearly disabled, and financially dependent) wife, Juleene Greene.

97.     Dan Hunt never contacted Plaintiff to inquire about Lamar's ownership interest in J&P Enterprises, Inc. (If he had, he would have learned that J&P Enterprises, Inc. was a Virginia corporation that no longer existed by the time of Lamar's death).

98.     For the next 11+ years (and continuing), Dan Hunt completely abdicated all his own statutorily [16] vested rights/responsibilities of "managing and controlling" J&P.

99.     Dan Hunt (improperly) gave Jeffery Greene complete, unsupervised, unchecked, unaccountable and unlimited control over J&P—including the responsibility of filing the corporations federal tax returns.

100.    Dan Hunt never reviewed J&P's financial records or tax returns, never visited J&P's corporate facilities in Gastonia, North Carolina and never attempted to "manage and control" J&P, the largest asset in Lamar's probate estate.

101.    Jeffery Greene furnished Dan Hunt with the above-referenced "Inventory" of Lamar Greene's probate estate, and Dan Hunt dutifully converted the list, almost verbatim (and apparently without correction (of obvious errors) and/or investigation) and filed same in the records of the Pickens County, South Carolina Probate Court.

102.    On January 15, 2016, Dan Hunt filed a "Recapitulation" Inventory and Appraisement (based entirely upon the information provided to him by Jeffery Greene) listing the following real estate properties:

---

[16] S.C. Code § 62-3-709

a. ½ undivided interest 144 Riverpoint Dr., Clemson, SC 29631 (Fair market value 390,800; value of decedent's interest 195,400)

b. ½ undivided interest 102 Camelot Dr., Gaffney, SC 29341(Fair market value 164,300; value of decedent's interest 82,150)

c. ½ undivided interest 5640 Gallagher Dr., Gaston, NC Parcel No. 146270 (Fair market value 557,000; value of decedent's interest 278,500)

the following Stocks and Bonds:

a. 51% interest in J&P Enterprises of the Carolinas, Inc. (NC) (Bankruptcy; **Appraised value $0**) (*emphasis added*)

b. 50% interest in J&P Securities, LLC (Dissolved, no assets)[17]

c. 16% interest in Palmetto State Enterprises, LLC (no assets)

d. Undetermined interest in The Legends of Tuscaloosa, LLC (lawsuit)

e. Undetermined interest in The Legends of Blacksburg (foreclosure)

f. Undetermined interest in Clemson Towers Homeowners Association, Inc. (SC) (non-profit. No assets)

and,

the following list of "encumbrances":

---

[17] The South Carolina Secretary of State's corporation website indicates that Jeffery Greene was the Registered Agent of an entity called "J&P Security, LLC" (i.e., an entity owned in equal 50% member interests by Jeffery and Lamar)—and *not* J&P Securities, LLC as listed in Dan Hunt's Inventory. J&P Security, LLC was organized on October 10, 2002, and dissolved on August 19, 2010—thereby extinguishing Lamar's ownership interests in that entity. It is noteworthy that Jeffery Greene dissolved this entity 10 full months after Lamar's death and, within 3 months, he opened an another (unincorporated) entity called "JP Services" believed to be engaged in providing the same services, with the same customer base, using the same physical location as J&P Security, LLC.

a. Palmetto Bank (Cherokee County, SC) Total Encumbrance $97,000; Amt. of Encumbrance for which Estate is Responsible $48,500.

b. Palmetto Bank (Gaston County, NC) Total Encumbrance $423,000; Amt. of Encumbrance for which Estate is Responsible $211,500.

c. Nexity Bank v Rodriguez v. Greene, Case no. 7-09-2142-HFF, US Dist. Ct., Dist. S.C., Spartanburg Div. Total Judgment amount $4,173,635 (Amt. of Estate's responsibility $834,727)

d. Bankhead v. Greene et al., Case No. CL08-003534-00. Montgomery County Cir. Ct., Virginia-unpaid real Estate Commission ($186,750)

e. And Palmetto State Enterprises, LLC v Clegg Lamar Greene, et al Case No. 2008-CP-39-56 ($840,098)

103. Notably, Jeffery Greene did *not* list, describe and/or clarify the following business entities on the list of assets he provided to Dan Hunt (and it is still undetermined what interests Lamar Greene had in each, if any, at the time he signed his Last Will and Testament and/or at the time of his Death):

a. "J&P Enterprises, Inc.," (a Virginia corporation),

b. "J&P Enterprises of the Carolinas, Inc." (a South Carolina corporation),

c. "J&P Enterprises of the Carolinas, Inc." (a North Carolina corporation),

d. "J&P Security, LLC,"

e. Palmetto State Enterprises, LLC,

f. The Legends of Blacksburg, LLC,

g. The Legends of Tuscaloosa, LLC, and

h. Clemson Towers Development, LLC

104. On the basis of good faith and belief, Plaintiff alleges that, throughout the otherwise *inexplicably* drawn out probate case (which has been pending before the Pickens County Probate Court since early 2010, Defendant Jeffery Greene has "taken" (i.e., 'converted') certain valuable assets and properties from Lamar Greene's estate including, but limited to *at least* $230,000 in Certificate(s) of Deposit, several boats/watercraft, one or more jointly owned businesses, and the right(s) to receive income from certain real estate development projects (such as The Legends of Tuscaloosa, LLC).

105. None of those wrongful acts have ever been investigated by Defendant Dan Hunt.

106. Taken together, Dan Hunt concluded that the "Total Net Worth of the Probate Estate" was -(negative) $1,565,525.78. He treated the estate accordingly:

    a. Dan Hunt *never* took control of (or investigated the true value of) any of the *identified* corporate entities,

    b. he never investigated the full scope of Lamar Greene's probate assets/properties

    c. he never performed (or sought) an independent appraisal of those assets, and

    d. he never filed (or even reviewed) the financial records or tax returns which Jeffery Greene and Brenda Pressley prepared and filed for the business entity(ies) that were under Dan Hunt's legal control/responsibility.

107. Dan Hunt wrongfully and erroneously assumed, from the beginning, that when Lamar Greene specifically (and unambiguously) bequeathed *"…all of the stock owned at the time of my death in J&P Enterprises, Inc…."* he *probably* meant to bequeath his largest asset—the North Carolina corporate entity, "J&P Enterprises of the Carolinas, Inc.," to Jeffery Greene.

108. Then, acting from that false assumption, Dan Hunt completely abdicated *all* his legal responsibilities over J&P Enterprises of the Carolinas, Inc. in favor of RICO Defendant Jeffery Greene---for the next 12 years (and continuing).

109. Dan Hunt has always (erroneously) considered, treated and even (recently) referred to J&P Enterprises of the Carolinas, Inc. as "Jeffery Greene's company".

110. Further, at all relevant times, Dan Hunt knew (a) that, as the PR of Lamar's Estate, he held the majority (52%) "control" over J&P Enterprises of the Carolinas, Inc. and that Plaintiff Paula Painter only owned 24% (i.e., 24 shares) of that company.

111. He also knew that, as Lamar's residuary beneficiary, Juleene Greene is supposed to inherit Lamar's ownership interests in J&P Enterprises of the Carolinas, Inc., according to Lamar's Will.

## Jeffery and Sally's Continuing Efforts to Take ALL of Lamar Greene's Estate Assets—to the detriment of Juleene Greene

112. On January 10, 2017, RICO Defendants Jeffery and Sally Greene filed a Notice of Assignment of Claim by Palmetto State Enterprises, LLC, ("Palmetto") which purported to assign the entirety of Palmetto's claim for $1,027,039 *against Lamar Greene's Estate* to RICO Defendants Jeffery and Sally Greene.

113. On January 10, 2017, RICO Defendants Jeffery and Sally Greene filed a Notice of Assignment of Claim by Richard A. Rodriguez, ("Rodriguez") which purported to assign the entirety of Palmetto's claim for $4,173,634.86 (plus interest at the daily rate of $243,531.27) *against Lamar Greene's Estate* to RICO Defendants Jeffery and Sally Greene.

114. On April 3, 2017, RICO Defendants Jeffery and Sally Greene filed a Notice of Assignment of Claim by Lew Jordan, ("Jordan") which purported to assign the entirety of Jordan's claim for

$145,000 (plus interest) *against Lamar Greene's Estate* to RICO Defendants Jeffery and Sally Greene,

115.    On May 1, 2017, RICO Defendants Jeffery and Sally Greene filed a Notice of Assignment of Claim by Scott F. Tally, P.A., ("Tally") which purported to assign the entirety of Palmetto's claim for $25,438.95 *against Lamar Greene's Estate* to RICO Defendants Jeffery and Sally Greene.

116.    On May 20, 2021 Dan Hunt filed pleadings in the probate case to bring all of Lamar's heirs and beneficiaries into the probate case, as 'interested' parties, including both Plaintiff and Lamar's surviving wife, Juleene Greene.

117.    Almost immediately, questions were raised (by the undersigned and by Juleene Greene's attorney, respectively) regarding (1) what consideration, if any, Jeffery and Sally Greene had actually paid for each of the above-referenced Assignments[18], and (2) whether Jeffery and Sally Greene had been acting as *Executor(s) de son tort* when they obtained each of the Assignments.

118.    In July 2023, after many *years* of misleading information and ignored requests, J&P Tax Returns were finally made available to Plaintiff Paula Greene Painter.  The initial review and ensuing data analysis showed a steeply increasing corporate expense relative to the income and constant (level—unchanging) salary paid to Jeffery Greene, but the sworn returns also reflected what Plaintiff had always been told by Jeffery Greene, to wit: that J&P showed little to no profit above the level of its expenses.

119.    Dan Hunt propounded written discovery to Jeffery and Sally Greene to obtain any/all documents or records evidencing any actual consideration exchanged for the Assignments, but

---

[18] Only the smallest (in value) of the Assignments recites an amount of consideration paid for same.

RICO Defendants Jeffery and Sally Greene could only produce one (1) check in the approximate amount of $1200 that was purportedly paid in connection with the purchase of the Assignments.

120. In Response to RICO Defendants Jeffery and Sally Greene's inability to provide evidence, that they had *actually* paid any actual consideration for the Assignments, it appeared that RICO Defendants Jeffery and Sally Greene had simply attempted to use fraudulently obtained Assignments in a 'property grab' (i.e., to take *all* of the assets of Lamar Greene's estate for themselves, to the detriment of Lamar's surviving wife, Juleene Greene).

121. Dan Hunt amended his pleadings in the probate court, charging RICO Defendants Jeffery and Sally Greene with allegations of fraud on Lamar Greene's estate and wrongfully acting as *executor de son tort*. (See **Tab 1**, *supra*)

122. However, despite alleging that RICO Defendants Jeffery and Sally Greene had acted fraudulently, Dan Hunt failed or refused to investigate the facts in support of his Amended claims and/or otherwise to conduct *any* discovery to support his accusations.

123. RICO Defendants Jeffery and Sally Greene failed to file a timely Answer to Dan Hunt's Amended Complaint and remained in "Default" on those amended claims for the next four (4+) months.

124. Eventually, on April 22, 2024, Dan Hunt filed a Motion to Enter Default[19] against Jeffery and Sally but again, for several months, he made no effort to follow through on his Motion.

125. Realizing that Dan Hunt was either incapable, incompetent or unwilling to do his job as the PR of Lamar's estate (and that he had wholly failed to discharge his legal duties as PR theretofore), Plaintiff undertook her own independent investigation of her father's estate and the integrity of J&P's financial management under Jeffery Greene.

---

[19] See **Tab 10**

## Recent Events

126.    In early April 2024, Paula Greene Painter was (after many unsuccessful attempts) able to obtain the full/complete financial records of J&P Enterprises of the Carolinas, Inc. (i.e., through September 2023) going back to approximately 2005.

127.    Upon receipt of same, it was *immediately* obvious to Plaintiff that RICO Defendants Jeffery and Sally Greene had used and exploited the North Carolina Entity, J&P Enterprises of the Carolinas, Inc., as their *alter ego* (to an almost unimaginable degree) always since Jeffery Greene assumed 'sole' control of the company's financial management on January 23, 2009.

128.    Between April and August 2024, the undersigned subpoenaed records from a selected sample of J&P's alleged vendors and the federal income tax returns for RICO Defendants Jeffery and Sally Greene.

129.    After receiving *strong* evidence that supported Dan Hunt's amended claims against Defendants Jeffery and Sally Greene, it also became clear and apparent that Dan Hunt had *never* taken control and had *never* exercised any degree of oversight over J&P Enterprises of the Carolinas, Inc.—the largest asset in Lamar Greene's Estate.

130.    Dan Hunt, apparently not wanting to know or 'discover' the evidence incriminating RICO Defendants Jeffery and Sally Greene (i.e., which *also* revealed the evidence of his own failures as the PR of Lamar's estate), became highly resistant to Plaintiff's urging to 'take control' of J&P Enterprises of the Carolinas, Inc., by using his 52% majority shareholder position as PR.

131.    Between July and August 2024, Plaintiff provided Dan Hunt with voluminous evidence and summaries of evidence clearly evidencing and documenting (a) a long-standing pattern of financial mismanagement over J&P Enterprises of the Carolinas, Inc. by RICO Defendant Jeffery Greene and (b) an active and ongoing RICO conspiracy among all RICO Defendants to aid and

abet the goals and purposes of an unlawful RICO Enterprise through a long-practiced "pattern of racketeering" activity(ies).

132.    On August 21, 2024, after many weeks of requesting, imploring, and urging by the undersigned and Plaintiff, Dan Hunt signed a "Consent to Act Without a Shareholder's Meeting"[20] as authorized by N.C.G.S.§55-7-04, so Plaintiff Paula Greene Painter could take Jeffery Greene's position as J&P's sole acting Director and so she could, in turn, commission a comprehensive forensic audit and analysis of the fiscal operations of J&P Enterprises of the Carolinas, Inc. under Jeffery's term of sole leadership and control.

133.    However, before the forensic investigator could be hired (and before Plaintiff could access the necessary funds from J&P to hire her), Dan Hunt learned that RICO Defendants Jeffery and Sally Greene had hired a "new" attorney—a 50+ year friend of Dan Hunt, named Douglas Patrick.

134.    Immediately, Dan Hunt contacted the court and asked that his pending Motion (i.e., to hold Jeffery and Sally Greene in default for their failure to answer his Amended Complaint) be lifted.[21]

135.    At the same time, working together with Douglas Patrick and his law partner, Austin Watts, Dan Hunt scheduled a "secret" mediation for all parties in the probate case *except* Plaintiff (and with no notice to Plaintiff), in a hasty attempt to bring complete closure to the probate case and to assist Jeffery Greene into the immediate receipt of Lamar's ownership interests in J&P Enterprises of the Carolinas, Inc.

136.    The 'secret' mediation was unsuccessful, but Jeffery Greene's attorneys asked Dan Hunt to "reverse" the August 21, 2024 Consent—thereby *preventing Plaintiff from accessing J&P's*

---

[20] (1st) Consent to Act Without a Shareholder's Meeting
[21] See **Tab 11**

*funds for purposes of starting the above-referenced forensic investigation of J&P's financial history under Jeffery Greene's sole management.*

137.    On August 30, 2024, Dan Hunt agreed with Attorneys Patrick and Watts to sign a second Consent agreement, [22] this time removing Paula Greene as J&P's Director and re-appointing Jeffery Greene as J&P's sole Director. (Note: Dan Hunt never used his majority (52%) control over J&P to assume a second (still-empty) position on J&P's Board of Directors and/or to otherwise appoint anyone else to that position—instead allowing Jeffery Greene to serve as J&P's only Director at all relevant times).

138.    Next, feigning a position of neutrality, Dan Hunt sent an email [23] to all the attorneys in the probate case stating that he would be using funds *from the estate's account* (i.e., but *not* J&P's accounts) to commission a *limited* forensic investigation of J&P's financial dealings (going back to the date of Dan Hunt's appointment as PR).

139.    Almost immediately, Jeffery's attorney, Austin Watts, sent an email response [24] curiously 'objecting' (*i.e., purportedly on behalf of Juleene Greene*) to Dan Hunt's plan for a forensic accounting.  (Note: At all relevant times, Juleene Greene has been represented in the probate case by Tyler McLeod--a Greeneville, S.C. attorney)

140.    On information and belief, Dan Hunt has never (i.e., as of the filing of this Complaint) initiated any forensic investigation(s) and/or otherwise done *any* investigation of (a) Jeffery Greene's financial management over J&P's funds, or (b) to support Dan's own allegations against Jeffery Greene and Sally Greene of fraud and *executor de son tort.*

---

[22] See **Tab 12**
[23] See **Tab 13**
[24] See **Tab 14** Austin Watts, sent an email response

141.   Dan Hunt was emboldened by the appearance of Douglas Patrick as Jeffery Greene's new attorney in the probate case and, despite all of his failures, mistakes, and his highly biased (irrational) actions as PR, Dan Hunt has only "doubled down," since that time—completely 'aligning' with Defendants Jeffery and Sally Greene (and their attorneys), opposing Plaintiff's efforts to investigate Jeffery Greene's mishandling of J&P's finances, and accelerating his efforts to cover up his own 11+ year history of extreme negligence and incompetence as Lamar Greene's PR.

142.   Dan Hunt has refused to resign and/or withdraw from his position as the PR of Lamar Greene's estate—all while "pushing" hard for a settlement of that estate (for reasons stated above)—despite the extreme detrimental impact such a settlement would have upon the rights of J&P, Plaintiff and the estate's sole (actual) remaining beneficiary Juleene Greene.

143.   Even after it has been called to Dan Hunt's attention that he either 'misread' or 'misinterpreted' Lamar's specific bequest (and/or failed to properly investigate the assets comprising Lamar Greene's estate—which specifically included ownership interest in "J&P Enterprises, Inc." at the time Lamar signed his Will), he has only 'doubled down'—i.e., 'teaming up' with Jeffery and Sally Greene's attorneys in attacks aimed at Plaintiff and the undersigned.

144.   Since January 23, 2009, Jeffery Greene has masterminded, led and overseen the RICO Defendants in and through a series of related and continuous "racketeering acts" (i.e., more specifically defined and described below), in an association-in-fact Enterprise with the goal and objective of converting and wrongfully appropriating/acquiring:

    g.      valuable real estate assets owned by Jeffery Greene's mother, Margie Greene,

h.   valuable real estate assets owned by Lamar Greene's vulnerable surviving wife, Juleene Greene, whom Lamar also designated as the residuary beneficiary under his Last Will and Testament,

i.   *all* the assets of Lamar Greene's estate,

j.   *all* the assets in (and/or claimed to be in) Lamar Greene's Estate,

k.   *all* the assets, revenues, profits, and corporate opportunities of J&P (i.e., summarily described above), and

l.   *all* of Plaintiff Paula Painter's rights as a minority shareholder, including (but not limited to) her rightful share of corporate profits each year from January 2009 to the present.

145.   J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities throughout the time starting on January 23, 2009, and lasting through the filing of this Complaint and the final Orders in this case.

146.   In April 2024, because of activities in the Pickens County probate case, Plaintiff obtained the complete record of all of J&P's financial transactions under Jeffery's sole management and control-- after 15 years of receiving no truthful information from Jeffery Greene.**[25]**  The evidence of the RICO Defendants' self-dealing is extensive, detailed and informative.

147.   The newly discovered evidence amply-documents Jeffery Greene Family's blatant and complex racketeering activities/schemes starting on January 23, 2009, and continuing through the filing of this Complaint.

---

[25] Through this detailed information, Plaintiff discovered that J&P's tax returns since 2009 are a complete and total, fraudulent sham.

148.    The discovery of those records, followed by the records from J&P's *supposed* 'vendors' (i.e., which received an estimated $30,000,000 to $35,000,000 in payments from J&P over that same period) revealed the basis for the claims asserted in this Complaint for the first time.

149.    The Plaintiff's analysis of those records is ongoing.  **It is anticipated that many additional RICO claims and other federal and state claims against the RICO Defendants will be discovered** through Plaintiff's continuing analysis and through reasonable discovery in this case. Plaintiff reserves the right to amend her Complaint to state those claims as sufficient evidence of same is discovered.

## Part Two: "Targeted" RICO Schemes (Against Jeffery Greene's Original Family Members)

Plaintiff's first Discovery: Jeffery Greene's *Alter Ego* Use of J&P as the main Instrumentality of a RICO Enterprise—including documentary evidence of *multiple* predicate acts establishing a clear "pattern of racketeering.

150.    From the time Jeffery assumed control of J&P on January 23, 2009, he began using and treating J&P as his *alter ego,* breaching his fiduciary duties to Plaintiff, a 'powerless' minority shareholder, and using J&P as an instrumentality for money laundering, tax fraud, and illegal "racketeering," and to further advance the goals and purposes of an unlawful RICO "Enterprise", to wit: the personal enrichment of Jeffery Greene and his other family members.

151.    Using and treating J&P and its accounts as his own (personal) property, Jeffery Greene caused J&P to expend its money (directly) for:

    a.    his family's living expenses (including mortgage payments, utilities, taxes, food, entertainment, travel, automobiles, boats, recreational vehicles, insurance, accounting services, thousands of credit card purchases, gas, food, purchases, entertainment, etc.,

b.      the repair, upkeep and taxes on several personally owned rental properties,

c.      contributions to simple IRA plans for himself and all the members of his immediate family including Sally M. Greene, Harrison Greene, Samuel Carter Greene, Simeon Ross Greene—none of whom were employed by J&P at the time said "benefits" were paid to them and/or on their behalf,

d.      real estate investments titled in the names of himself and his wife, Sally Greene, and/or in the name(s) of other corporate entities exclusively owned and controlled by Jeffery and Sally Green,

e.      expensive vacations, travel and entertainment for each member of the Jeffery Greene family,

f.      country club and private golf memberships, including other ticket and member purchases with such memberships (Clemson University football VIP ticket-blocks, parking, IPTAY membership and privileges and benefits, etc.),

g.      many other purchases and expenses for the exclusive consumption, use, enrichment, enjoyment and benefit of each member of the Jeffery Greene family.

152.    Jefferey Greene also used J&P's revenues and profits to perpetrate a series of fraudulent RICO schemes against every member of Lamar Greene's original family (i.e., detailed separately below) and against his father's (still pending) probate estate (above)—all for the personal enrichment of Jeff Greene, Sally Greene and their three (3) adult sons, Harrison Greene, Samuel Carter Greene, and Simeon Ross Greene.

153.    Jeffery also used another *alter ego*—the no longer existing 'company' known as "J&P Enterprises, Inc."—as an instrumentality (and active part) of the above-described racketeering activity.

## The Margie Greene Scheme

154. Margie Greene's cancer recurred in November 2003, requiring surgery, radiation and chemotherapy in 2004.

155. On May 1, 2004, Margie inherited a 50% interest in a parcel of real estate known as Hilton Head Beach Villa ("HHBV 18"), from her aunt, Irene Morris. The *other* 50% share was inherited by Margie's uncle, Charles Morris. At that time, the total estimated value of the Hilton Head Villa was $750,000.

156. On June 14, 2004, just six (6) weeks after she learned of her inheritance, RICO Defendant Jeff Greene initiated a scheme, together with RICO Defendant Sally Greene, to take the title to Margie's inherited property away from her.

157. Margie had just completed eye orbit surgery and a course of radiation and chemotherapy, and her mental and cognitive capacities were severely compromised. Nevertheless, Jeffery Greene persuaded Margie to "give" her 50% share of HHBV 18 ownership to him so he could, "…use that property as collateral," "…purchase [the *other* owner's] 50% [ownership] share, …" and "…'protect' the property for the benefit of [Margie and her entire family, including Paula and her family." [26]

158. Jeffery assured Margie that she would always have complete access to "her" property, and that he could "…fix it up and rent it out, on a part time basis, and then use the rental income to supplement Margie's [social security] income…."

---

[26] See **Tab 15**, Jeffery's own summary of the transaction.

159.    Jeffery also promised Margie that, upon her death, he would divide Margie's 50% share evenly with Paula (Margie's daughter and Jeffery's sister), such that Paula would receive a 25% ownership interest in the property.

160.    In the document, Jeff promised that Margie's "equity" in the amount of $375,000 would be treated as if it were "invested" in stocks, and that Margie would receive a 4% yield on her 'investment', which he calculated to be an estimated payout of $1,000 monthly.

161.    Relying upon her son's representations and promises, Margie signed over her Deed to Jeffery and Sally Greene, and they immediately began the process of purchasing the other owner's 50% share in the property—also in the names of himself and RICO Defendant Sally Greene.

162.    Jeffery's Summary (i.e., See **Tab 15**) specifically described how Margie's share of equity "…would always be maintained and owned by Paula upon Margie's death."

163.    As soon as Jeffery's purchase of the other 50% owner's share was accomplished, everything changed.  At that point, Jeffery began refusing to honor his commitments to Margie.

164.    Almost every time Margie requested to use the property, Jeffery denied her access.  The promised monthly payments to Margie were invariably late. Jeff stopped payments for long periods at a time—putting Margie in extremely stressful financial circumstances.

165.    These broken promises caused a relational rift between Jeff and Margie.

166.    Jeffery and Sally made several payments on a highly irregular basis to Margie from their personal bank accounts.  Often, those payments were late (or missed entirely), which caused Margie extreme hardship as she was financially dependent on those checks for her ongoing support.

167.    On May 10, 2016, Jeffery started making his regular monthly payments to Marge from the accounts of J&P Enterprises of the Carolinas, Inc., and *not* from his own personal account, even

though Jeffery had titled the HHBV #18 property in the name(s) of himself and RICO Defendant Sally Greene, his wife.[27]

168.    Each of those payments were, in turn, claimed as deductions on J&P's yearly tax returns for 2016, 2017, 2018 and 2019.  (Plaintiff has obtained most of the tax returns for J&P and for each of the members of the Jeffery Greene Family—individually, for all relevant times hereto; however, Plaintiff shall provide those to the Court upon such conditions as the Court may later direct, so as to prevent the disclosure of the Defendants' respective 'private' information (i.e., to the extent information is not directly relevant to the claims stated herein is included in said tax returns.)

169.    In each payment issued from J&P's accounts, the descriptions for each payment in J&P's financial software was altered to disguise, conceal or mislead the IRS and/or any other interested person and/or auditor reviewing the books and records of J&P.

170.    Each such payment was also reported on J&P's tax returns as a "J&P consulting fee" expense and claimed as a deduction.

171.    Margie never provided "consulting" services to J&P, at any time.  Each time Jeffery wrongfully coded the payments to Margie as "consulting fees", he had actual knowledge that such representations were blatantly false.  He also had actual knowledge that Margie had been determined by her physicians, to be "incapacitated' and/or otherwise.[28]

172.    Each J&P check was delivered by Jeffery to Margie through the mails.

---

[27] See **Tab 16** (i.e., HHBP #18)
[28] See **Tab 17** (Documentary evidence of Margie's incapacity)

## Specific "Predicate" Acts-examples

173.    On October 23, 2018, J&P check number 67329, drawn against J&P's checking account at the Carolina Trust Bank, in the amount of $1,000 was deposited (and postmarked) in the U.S. Postal Service, from a Charlotte area post office and addressed for delivery to Margie Greene at the following address: 4544 Ashmore Circle, Marietta, Georgia 30066. A true and accurate copy of the check and envelope that Jeffery used to deliver each such payment are attached as **Tab 18**, and incorporated by reference herein for all purposes, the same as if specifically set forth herein.

174.    On January 28, 2019, J&P check number 68507, drawn against J&P's checking account at the Carolina Trust Bank, in the amount of $1,000 was written (and postmarked) in the USPS, addressed for delivery to Margie Greene at the following address: 4544 Ashmore Circle, Marietta, Georgia 30066. A true and accurate copy of the check and envelope that Jeffery used to deliver each such payment are attached as **Tab 19**, and incorporated by reference herein for all purposes, the same as if specifically set forth herein.

175.    On December 2, 2016, J&P check number 62846, drawn against J&P's checking account at the Carolina Trust Bank, in the amount of $2,000 was written and then deposited in the USPS, addressed for delivery to Margie Greene at the following address: 273 Manley Court, Woodstock, Georgia. A true and accurate copy of the check and envelope that Jeffery used to deliver each such payment are attached as **Tab 20**, and incorporated by reference herein for all purposes, the same as if specifically set forth herein.

176.    A detailed summary chart of those transactions (i.e., listing and detailing the date(s), amounts(s), and method(s) of delivery for each of Jeffery's thirty-one (31) monthly checks to

Margie) is attached hereto as **Summary Chart 1**[29] and incorporated herein by reference for all purposes, the same as if specifically set forth at length, *verbatim*.

--

177.    On June 21, 2006, Margie was so upset by Jeffery's fraudulent actions towards her that she decided to re-write her Will.[30]

178.    In it, Margie refers to the above-described" transaction wherein Jeffery convinced her to convey her interest in her most valuable asset to him, as a so-called "gift." Margie's Will states, ".... [t]his gift was contingent upon my son assigning one half of my one-half interest to my daughter, his sister, upon my death."

179.    In approximately July 2007, Jeffery discovered Margie's re-written Will.  From that point on, Jeffery began distancing himself from Margie, eventually ceasing all communications with her. He made no attempts to honor the promises that he used to induce the transfer of his mother's valuable property to him.

180.    Jeffery's complete estrangement of Margie progressed to totality for the rest of Margie's life.

181.    In approximately April 2018, a full year before Margie's death, Jeffery sold the Hilton Head Villa and purchased another Hilton Head property, located at 32 Sand Dollar (through a wholly owned limited liability company called 32 Sand Dollar, LLC, applying the equity from the fraudulently obtained Hilton Head Beach Villa 18 property to the purchase of the property at 32 Sand Dollar.

182.    Margie died on February 9, 2019.

---

[29] See **Summary Chart 1**
[30] See **Tab 21** (Margie Greene's Will)

183.    J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

## The "32 Sand Dollar LLC"—Hilton Head Scheme (RICO Defendants Jeffery and Sally Greene)

184.    In March 2018, Jeffery Greene formed a South Carolina limited liability company, "32 Sand Dollar, LLC" [31] to serve as the "purchaser" for a March 14, 2018 real estate transaction. Then, he acquired the property--located at 32 Sand Dollar Road in Hilton Head, South Carolina.[32]

185.    Jeffery and Sally sold HHBV #18 on or about May 29, 2018.[33] He applied the accumulated equity collected from that scam against the 32 Sand Dollar mortgage loan.

186.    On May 3, 2018, Jeffery Greene began making *weekly* payments using the funds (and paying directly from the bank accounts) of J&P Enterprises of the Carolinas, Inc.[34] These payments were made from 2 different J&P checking accounts to 3 different Payees, but all payments were applied against the purchase of the 32 Sand Dollar property. (See **Summary Chart 2**)

187.    Between May 3, 2018, until September 9, 2019, Jeffery Greene used J&P funds to make a total of sixty-five (65) direct payments in the collective amount of $148,000 to First South Bank, and then between October 22, 2019, and January 27, 2021, Jeffery used J&P's monies to make thirty-eight (38) more direct payments, collectively totaling $114,085, to First Citizens Bank. (See **Summary Chart 2**)

---

[31] See **Tab 22**)
[32] See **Tab 23**-- 32 Sand Dollar LLC Deed
[33] Deed for sale of HHBV #18. (Note: This sale was part of a 1031 Tax Exchange and that the equity from HHBV#18 was invested into the 32 Sand Dollar property).
[34] See **Summary Chart** 2 (i.e., These payments ranged between one thousand dollars ($1,000) and five thousand ($5,000), and were made to First South Bank, which later became known as First Citizens Bank. Later, Jeffery and Sally Greene took out another mortgage loan at _____).

188.    On March 16, 2021, the 32 Sand Dollar property was deeded by 32 Sand Dollar, LLC to Jeffery and Sally Greene.[35] From this point on, Jeffery and Sally Greene continued making payments from J&P's bank accounts. (See **Summary Chart 2**)

189.    Between July 6, 2021 and September 1, 2022, Jeffery Greene used $87,518.52 of J&P's money to purchase 32 Sand Dollar through fifty (50) separate transactions. (i.e., after the property had been transferred into the names of Jeffery Greene and Sally Greene). (**See Summary Chart 2**)

190.    Because Jeffery was making mortgage payments to the above referenced banks, his payments were applied not only to the mortgage loan but also to the Beaufort County property taxes, as they became due.

191.    Each of the above-described transactions were contemporaneously recorded in J&P's Quickbooks® financial management program by RICO Defendant Jeffery Greene and/or other individuals working under his direct authority and supervision, at or near the recorded date(s) of each transaction, in accordance with the usual and customary business practices of J&P

192.    Each of the above-described payments were made by a physically issued and dated "check"[36] or by way of an electronic funds transfer ("EFT") which RICO Defendant Jeffery Greene then caused to be deposited into the US mails or to be sent online for delivery to the First South Bank, First Citizens Bank and Truist Bank, respectively.

---

[35] Deed on 32 Sand Dollar property to Jeffery and Sally Greene.
[36] A true and correct copy of each check will be provided to the Court (by way of a supplemental pleading) as such documents are obtained during discovery. Plaintiff has verified the existence of said checks (i.e., through a subpoena issued and served in the Cherokee County Probate case) and is working expeditiously to obtain those checks at this time.

193. Each of the transactions described in paragraphs 186 through 192, *supra*, constituted a separate "predicate act" in violation of 18 U.S. Code §1341 (mail fraud), 18 U.S. Code §1343 (wire fraud), 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

194. More specifically,

    a. Operating from his position of special trust and responsibility as J&P's sole Director, controlling shareholder, and operating Manager, Jeffery Greene caused J&P to enter a series of fraudulent and unlawful transactions (i.e., using and applying monies embezzled and/or converted by Jeffery Greene from J&P's financial accounts) for Jeffery's own personal benefit, thereby breaching his fiduciary duties to Plaintiff and to J&P,

    b. Next, Jeffery Greene used the mails (in violation of 18 U.S. Code §1341, mail fraud) and/or used the wires (in violation of 18 U.S. Code §1343, wire fraud) to deliver each payment listed in **Summary Chart 2**, each time committing a separate predicate act (in violation of 18 U.S. Code §1962(c),

    c. Contemporaneously, Jeffery Greene and/or others operating under his direct supervision, control or authority, *falsely* 'coded' or recorded each of the above-listed payments (in **Summary Chart 2**) as either

        (i) "2291 · Loan from Jeff Greene",

        (ii) "2300 · LOAN FROM OFFICER-L. GREENE", or

        (iii) "5000 · PURCHASES/R" (i.e., an account used to record J&P's purchases of inventory for resale purposes),

so as to cause each transaction to be falsely 'memorialized' as a deductible expense and *not* a distribution of J&P's distributable profits to Jeffery Greene), in violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax), 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements), 18 U.S. Code §1962(c), (RICO-racketeering) and 18 U.S. Code §1962(d) (Conspiracy to commit a violation of 18 U.S. Code §1962(c)),

d.   Jeffery Greene also used an entity under his own sole ownership, direct supervision, control and/or authority, 32 Sand Dollar, LLC, as a 'cover' for acquiring the above-described Hilton Head Property, in violation of 18 U.S. Code §§1956 and 1957 (i.e., money laundering), and, finally,

e.   Each of Jeffery Greene's uses/expenditures of J&P's (tax-deductible funds, to J&P and untaxed funds/income to Jefferey and Sally Greene) funds to acquire real property in the names of Jeffery and Sally Greene was, a violation of §§1956 and 1957 (i.e., money laundering to avoid taxation),

195.   RICO Defendant Brenda Pressley prepared and filed J&P's *sworn* tax returns for the tax years 2018, 2019, 2020, 2021 (i.e., each of the tax years in which the above-listed transaction occurred), through aid and assistance of Jeffery Greene.

196.   Each of the above-referenced J&P tax return(s), included false and fraudulent claims (i.e., claims that the above-listed payments were 'tax deductible' operating expenses of J&P).  Each such false and fraudulently listed (i.e., claimed) deduction constituted a separate violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements) and separate "predicate acts" under 18 U.S. Code § 1962(c).

197.    The individual *sworn* joint tax returns for Jeffery Greene, Sally Greene and Sand Dollar LLC, respectively (i.e., for the tax years 2018, 2019, 2020, 2021) confirms that <u>none</u> of the above-listed mortgage payments was claimed as *"income"* to Jeffery Greene, Sally Greene or Sand Dollar LLC.  Each such failure constitutes a separate violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements) and a separate "predicate act" under 18 U.S. Code § 1962(c).

198.    Each such failure by Jeffery Greene, Sally Greene and Sand Dollar LLC to report taxable "income" (for each of those distributions) also constitutes a separate violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements) and a separate "predicate act" under 18 U.S. Code § 1962(c).[37]

199.    In addition to the foregoing, RICO Defendants proximately caused damages to the respective business and property interests of Plaintiff and J&P each time Jeffery Greene initiated and carried out the above-described pattern of racketeering.

---

[37] Jeffery Greene created Sand Dollar, LLC for the primary purpose of money laundering in violation of 18 U.S.C. §1956 (relating to the laundering of monetary instruments) 18 U.S.C. §1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).  It is notable that he and Sally Greene did, in fact, use the Sand Dollar property as a rental property and received more than $170,000 in rental income over a period of approximately three (3) years (i.e., 2018 -2021), lawfully reporting that "laundered" income on their individual tax return(s).

## Specific "predicate" acts—examples

200. By way of illustration, J&P check number 67607, written on May 3, 2018 for $5000 through J&P's United Bank Checking account (1001) was 'coded' to J&P's Quickbooks account #2291 (i.e., a *liability* Account entitled "Loans from Jeff Greene") which was then *actually deducted* (on J&P's corporate tax return) as if J&P had made a loan repayment to Jeff Greene.

201. J&P check number 67697, written on May 16, 2018 for $5000 through J&P's United Bank Checking account (1001) was 'coded' to J&P's Quickbooks account # 5000 Purchases (i.e., an *inventory account* entitled "cost of goods sold") which was then *actually treated* (for tax purposes) as if J&P had spent $5,000 purchasing Inventory for resale purposes and *not* for paying 32 Sand Dollar, LLC's Mortgage Note for the purchase of RICO Defendants' Hilton Head home.

202. J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

## The Juleene Greene Scheme

203. During the period between January 23, 2009, and October 29, 2009, (i.e., the period of Lamar's hospitalization) Juleene Greene took a partial leave of absence from J&P, where she had always worked as a clerical bookkeeper under Lamar Greene. Juleene worked from her home but continued to check in as needed with the clerical assistant to provide oversight to J&P's bookkeeping activities.

204. Immediately after Lamar's death, Julie underwent a second surgery for a crippling accident of her foot, having postponed the needed surgery while Lamar was hospitalized, with a full fusion of the ankle joint. This required months of recovery and therapy.

205. As soon as her therapy was completed, she returned to her full-time duties at J&P.

206.    It was well-known that, until Lamar's estate was settled, Juleene had no other means of supporting herself and her prospects for another job were not encouraging due to her age and physical challenges.

207.    The relationship between Juleene and Jeffery was strained, but since Jeffery had taken over the company's management and control in Lamar's stead, she reported to him.

208.    Jeffery had previously told Juleene he would be inheriting all his father's stock in J&P, and Juleene did not know otherwise.

209.    Juleene *mistakenly* assumed that Jeffery (with Dan Hunt's oversight) understood Lamar's Will correctly, so she never questioned what she understood as Dan's 'legal' conclusion. Instead, she accepted the fact that she would have to look to her earnings as her sole source of financial support while waiting for Lamar's estate to settle.

210.    In approximately November 2011, Jeffery Greene asked Juleene for a $50,000 personal loan. Juleene told Jeffery that she felt financially insecure and very vulnerable while she waited for Lamar's estate to settle. She also told Jeffery that she "…did not feel comfortable giving [Jeffery] a personal loan, and this infuriated Jeffery.

211.    In mid-December 2011, just two (2) weeks after Juleene refused to loan $50,000 to Jeffery, he told her he thought it was time for her to "move on". Despite having no other means of support, Juleene acquiesced, and resigned.

212.    By 2013 Juleene was under severe financial pressure. She learned that there was an interested potential buyer for her valuable property located at 144 Riverpoint, Clemson, South Carolina.

213.    Juleene told Jeffery that the interested buyer wanted to pay $396,000 for the property.

214.     Jeffery told Juleene he wanted to buy it and that he would pay off the balance remaining on her mortgage loan.[38]

215.     Jeffery knew that Juleene was under overwhelming financial pressure.  Inexplicably, there had been no progress in the resolution of Lamar Greene's estate and Juleene was struggling to make the monthly mortgage payments on her property in Clemson, South Carolina.

216.     Capitalizing on Juleene's financial vulnerability, Jeffery devised a scheme to acquire Juleene's interest in a lake-lot property known as "144 River Pointe," located in the most desirable location of one of Lamar's most-prized development projects in Clemson, South Carolina.

217.     The 144 River Pointe property was owned in equal shares by J&P and Lamar/Juleene. Jeffery offered to pay Juleene $269,000 for her share. She agreed.

218.      At the real estate closing, on August 26, 2013, Jeff and his attorney, Scott Tally, presented a Warranty Deed conveying her share of the property to Jeffery and Sally Greene. See **Tab 26**.

219.     In a surprise twist, Jeffery only presented a check to Juleene for $25,000.  He assured her that "…the rest [of the funding] would be soon delivered…" to her.

220.     Jeffery's representations were material and false, and Jeffery knew so at the time he made those representations.  Jeffery made those representations for the purpose of inducing Juleene to rely on his promises (rather than his actions) and to induce Juleene to proceed with (and close upon) the transaction without receiving the agreed-upon amount.

221.     Juleene reasonably relied upon Jeffery's false representations.

222.     Jeffery's closing attorney, Scott Tally, falsely stated the true facts of the transaction in an Affidavit included with the closing documents. That Affidavit fails to state that Jeffery only gave

---

[38] The 144 Riverpoint 15-year mortgage note was in its 11th year at the time, with very little remaining.

Juleene $25,000 at the time of the closing. Instead, the Affidavit recites that Defendants Jeffery and Sally Greene gave Juleen Greene $269,000 for her ownership share.

223.    Jeffery and Sally Greene have never made the remaining (verbally promised) payment of $244,000.

224.    Adding insult to injury, Jeffery and Sally simply assumed the mortgage loan in Lamar's and Juleene's names (without authority or permission) and, even then, used *J&P's monies* (i.e., as opposed to their own personal funds/accounts) for payment of the continuing monthly mortgage payments for the purchase of the property.

225.    Between March 31, 2010 and March 3, 2016, Jeffery Greene used $339,370.92 of J&P's money to purchase the property at 144 Riverpoint, through seventy-seven (77) separate transactions, expensed in J&P financial software as "6500 Rent," "1060 Loan" and "2291 Loan from Jeff Greene."

226.    A detailed summary chart of those transactions is attached hereto as **Summary Chart 3**,[39] attached hereto and incorporated herein by reference for all purposes, the same as if specifically set forth at length, *verbatim*.

227.    They made a final, lump sum, payment on March 3, 2016, in the amount of $47,860.70, to pay the balance of the loan.

228.    Jeffery Greene followed the exact same racketeering pattern he and the other RICO Defendants had used in defrauding his mother, Margie Greene, described above.

229.    Each of the above-described transactions was contemporaneously recorded in J&P's Quickbooks® financial management program by RICO Defendant Jeffery Greene and/or other

---

[39] See **Summary Chart 3**

individuals working under his direct authority and supervision, at or near the recorded date(s) of each transaction, in accordance with the usual and customary business practices of J&P.

230.    Each of the above-described payments were made by a physically issued and dated "check"[40] or by way of an electronic funds transfer ("EFT") which RICO Defendant Jeffery Greene then caused to be deposited into the US mails or to be sent online for delivery to the Oconee Federal Savings and Loan.

231.    Each of the transactions described in paragraphs 225 through 226, *supra*, constituted a separate "predicate act" in violation of 18 U.S. Code §1341 (mail fraud), 18 U.S. Code §1343 (wire fraud), 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

232.    More specifically,

    a.    First, Jeffery Greene caused J&P to enter a series of fraudulent and unlawful transactions, for his own, personal enrichment and benefit (and the benefit of RICO Defendant Sally Greene), using monies embezzled and/or converted from J&P in breach of his fiduciary duties to both Plaintiff and J&P.

    b.    Jeffery Greene then used the mails (in violation of 18 U.S. Code §1341, mail fraud) and/or the use of wires (in violation of 18 U.S. Code §1343, wire fraud) to advance the goals and purposes of his RICO activity, thereby constituting a separate racketeering act (in violation of 18 U.S. Code §1962(c), RICO-racketeering).

---

[40] A true and correct copy of each check will be provided to the Court (by way of a supplemental pleading) as such documents are obtained during discovery. Plaintiff has verified the existence of said checks (i.e., through a subpoena issued and served in the Cherokee County Probate case) and is working expeditiously to obtain those checks at this time.

c.   Jeffery Greene and/or others operating under his direct supervision, control or authority, *falsely* 'coded' or recorded each of the above-listed payments as either "6500 Rent," "1060 Loan to Estate of Lamar Greene," or "2291-Loan from Jeff Greene".

d.   In each such case, Jeffery Greene falsely and fraudulently documented each of the payment(s) so as to cause each transaction to be falsely reported as a deductible expense and *not* a distribution of J&P's distributable profits to Jeffery or Sally Greene), in violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax), 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements), 18 U.S. Code §1962(c), (RICO-racketeering) and 18 U.S. Code §1962(d) (Conspiracy to commit a violation of 18 U.S. Code §1962(c)), and, finally,

e.   Each of Jeffery Greene's uses/expenditures of J&P's funds (i.e., so as to falsely characterize each such expenditure as a tax deductible operating expense of J&P) and to J&P and untaxed funds/income to Jefferey and Sally Greene) funds to acquire real property in the names of Jeffery and Sally Greene was, in itself a violation of §§1956 and 1957 (i.e., money laundering to avoid taxation),

f.   J&P's *sworn* tax returns for the years 2013, 2014, 2015 and 2016 (i.e., each of the tax years in which the above-listed transaction occurred) confirm that each of the above-listed payments was, in fact, claimed as a deduction as a J&P "expense", thereby reducing J&P's taxes--in direct violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements),

g.   On the basis of good faith and information received, Plaintiff contends that none of the above-listed seventy-seven (77) payments was claimed as "income*"* by Jeffery Greene

and/or Sally Greene on their *sworn* jointly filed individual joint tax returns for Jeffery

and Sally Greene (i.e., for the tax years 2013, 2014, 2015 and 2016 --each of the years

in which the above-listed transactions occurred). Therefore, each such failure to report

"income" also constitutes a separate violation of 26 U.S.C. §7203.

233. Jeffery and Sally Greene filed and recorded the Deed to 144 Riverpoint property in their

own names (as "owners") even though it was purchased entirely with J&P's monies.[41]

234. J&P and Plaintiff have each sustained damages to their respective business and/or property

interests, as a direct and proximate result of the above-described racketeering activities by

Defendants.

## The Scheme to Exploit J&P's IRA Matching Contributions for Employees

235. J&P has long had a company 'matched' Simple IRA benefit program/plan for its full-time

employees.

236. Between (*at least*) 2018 and 2023, Defendants Jeffery Greene, Sally Greene, Harrison

Greene, Samuel Greene and Simeon Greene ("collectively, the "participants") each knowingly,

intentionally, purposely and fraudulently conspired with Defendant Jeffery Greene, to unlawfully

participate in J&P's employer-matched IRA program.

237. More specifically, Plaintiff contends, in good faith and based upon information received,

that each of the above-identified Jeffery Greene family 'participants' knowingly and unlawfully

aided, abetted, and participated in a tax fraud scheme involving J&P's employer-matched IRA

contribution(s) Plan. Each of the Jeffery Greene family 'participants':

  a. received income and/or compensation from J&P over a period of several years,

     even though no actual employer-employee relationship *actually* existed.

---

[41] See **Tab 26** (Deed to the 144 Riverpoint property—titled in Jeffery and Sally Greene's names).

b. completed, signed and furnished (i.e., to J&P and the Internal Revenue Service) all of the required/necessary IRS tax forms and J&P's employee-related forms to create a false and fraudulent "employee" file—so as to satisfy IRS reporting requirements for participating in J&P's employer matching contributions program for "employees," (Note: Throughout most if not all of the time period(s) during which contributions were made into J&P's IRA matching-contribution plan, none of the Jeffery Greene family 'participants' (i.e., other than Jeffery Greene, himself) were actually employed by and/or actually providing labor or services to J&P), notwithstanding the false and deceptive documents in J&P's employee and tax files;

c. received 'compensation' from J&P (i.e., as an "employee"), without actually providing any work, labor or services to J&P) and without actually being 'employed' by J&P, and

d. made contributions into their respective IRA plan(s), and received matching contributions from J&P into said plans, and

e. completed, signed (under oath) and then either e-filed or mailed (for filing) their respective federal income tax return(s) for each of the year(s) in which they, respectively, received "income," or compensation, and/or matching contributions to their respective IRA Plans (from J&P),

and thereby knowingly participated in a scheme to defraud J&P, J&P's (non-participating) shareholders—including Plaintiff and the Internal Revenue Service.

238. Defendant Brenda Pressley knew that Jeffery Greene was fraudulently including and reporting that each/all the members of his immediate family were J&P employees when, in fact, they were not.

239.    Defendant Brenda Pressley knew that the information reported in J&P's tax returns for each year reflecting/including IRA matching contributions to members of Jeffery Greene's immediate family was materially false, and that the knowing preparation and filing of false and misleading tax returns for J&P was unlawful.

240.    Despite that knowledge, Brenda Pressley prepared and filed J&P's tax returns and falsely reported that members of Jeffery Greene's family had received compensation and benefits, respectively, as "employees" of J&P when none of them were so employed.

241.    All the distributions or "income" and/or IRA matching contributions from J&P to each of the Jeffery Greene family 'participants' were initiated and/or performed by Defendant Jeffery Greene, and all participants knew that Jeffery Greene has initiated or otherwise originated and/or performed each of those transactions.

242.    As a direct and proximate cause of the above-described financial transactions by and between Jeffery Greene and each of the 'participants' (and the IRS), J&P and Plaintiff have each, respectively, sustained damages to their respective business and/or property interests.

# Part Three:   The J&P Enterprises Scheme(s)[42]

243.    The focus of the RICO Defendants' other *known[43]* schemes, (i.e., described in this Complaint) involves Jeffery and Sally's targeted and fraudulent acquisition of property(ies) owned by:

> a.  the members of Jeffery Greene's original family, (i.e., including Margie Greene--Jeffery's mother, and Juleene Greene—Jeffery's stepmother),
>
> b.  J&P Enterprises of the Carolinas, Inc. (i.e., only described, thus far, to the extent that RICO Defendants have fraudulently exploited J&P's employer-matching IRA Plan for J&P's employees), and
>
> c.  the estate of Lamar Greene, (Jeff's father)

244.    However, RICO Defendants Jeffery Greene and Sally Greene have also engaged in a much broader[44] scheme *against* J&P Enterprises of the Carolinas, Inc. and its minority (and non-controlling) shareholder(s) from January 23, 2009 to the present (and continuing).

---

[42] The statement and description of this scheme only 'scratches the surface' of the actual scheme that started by Jeffery Greene in January 2009, which has continued *without interruption* since that time.  Despite several weeks of analyzing the newly discovered data/evidence documenting J&P's financial transactions under Jeffery Greene's sole and exclusive direction and management, the full scope of the J&P Enterprises scheme has only been *partially* analyzed (as of the date of the filing).  Plaintiff shall ask to amend her Complaint to provide a more-complete description of her claim (and other fraudulent schemes she discovers) as soon as additional facts are discovered and/or confirmed.

[43] Plaintiff only discovered actual evidence of RICO Defendants "racketeering activities" in late April 2024 and obtained some (limited) 'confirmation' evidence (i.e., clearly confirming the existence of a longstanding pattern of racketeering activities by RICO Defendants) between June and August 2024.  Plaintiff's investigation and analysis of the *extensive/complete* record of J&P's financial transactions under Jeffery Greene's oversight and direction is continuing.  Plaintiff expects that, as additional claims surface, she will need to Amend this Complaint to assert those claims and *possibly* against other/additional parties.

[44] This scheme, together with the Lamar Greene Estate Scheme, stated below, is believed to constitute the largest of the RICO Defendants' racketeering schemes.

245. This current and long-standing scheme is *expected to continue* unless and until judicial intervention occurs herein.

246. At the time Jeffery assumed operational control, and always since, J&P was owned by three (3) shareholders: Lamar Greene—52 shares (or 52%),[45] RICO Defendant Jeffery Greene—24 shares (i.e., 24%) and Plaintiff Paula Greene 24 shares (i.e., 24%) of the company.

247. Jeffery purported to act as J&P's sole Director, officer, manager and controller following the death of Lamar Greene on October 29, 2009, and always since (save and except the 6-day period which is addressed hereinabove).[46]

248. Jeffery established a regular practice of treating (i.e., using) J&P as his *alter ego,* and its revenues as the property of the members of the Jeffery Greene Family.

## The First J&P Enterprises Scheme to/for Enrich/Support of Each Member of The Jeffery Greene Family

249. As a regular pattern and/or practice of using J&P's funds to pay for the personal living expenses, bills, educational expenses, entertainment expenses, travel expenses, gifts, investments, real estate properties, and personal services used, provided to or acquired by the Jeffery Greene family members (i.e., on a routine and almost daily basis from January 23, 2009 to the present) RICO Defendant Jeffery Greene routinely and knowingly conducted financial transactions using J&P's monies with the intent to engage in conduct in violations of 18 U.S. Code §§ 1956 and 1957

---

[45] For reasons that remain unclear, Dan Hunt initially filed an Inventory in the probate case involving Lamar Greene's estate claiming only 51%. It is unclear whether this was, in fact, true or whether there exists a 1% shareholder who is not currently identified. However, always since the above-Inventory filing, Dan Hunt has made many representations that the Estate of Lamar Greene owns 52 shares (or 52%) of J&P Enterprises of the Carolinas, Inc.
[46] See Paragraphs 132-137, supra.

(i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

250.     RICO Defendant Jeffery Greene knew that it was unlawful for him to take steps (a) to actively conceal taxable income and/or the taxable income received by each member of the Jeffery Greene family, (b) to misrepresent the personal expenditures for each member of the Jeffery Greene family as tax deductible expenses or deductions of J&P, (c) to conceal his own taxable income, and/or (d) to otherwise falsely reduce J&P's tax liability (i.e., by claiming false and illegitimate deductions on J&P's tax returns) constituted an "unlawful activity" under 18 U.S. Code §§ 1956 and 1957.

251.     RICO Defendant Jeffery Greene also knew that the monies involved in each of the financial transactions, once embezzled and/or converted, represented the proceeds of an "unlawful activity" within the meaning of 18 U.S. Code § 1956 and, with that actual knowledge, intentionally engaged in conduct with respect to the handling of those financial transactions to commit violations of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

252.     Every member of the Jeffery Greene family knowing received and accepted each of the above-described payments, benefits, goods and services, with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986, and in violation of 18 U.S.C. 1956(a)(1)(A)(ii).

## Specific (Typical) Examples of J&P Payments to and/or for the Benefit Of Each Member of the Jeffery Greene Family

253.     The following specific transactions are typical/representative examples illustrating how Defendant Jeffery Greene used J&P's funds to pay for the use, benefit and enrichment of each

member of the Jeffery Greene family <u>and</u> how each such RICO "Person(s)" each received and accepted the benefit of such payments:

      A.    **<u>Payments to/for the benefit of Defendant Jeffery Greene</u>**

      (1)    On December 2, 2020, Jeff Greene wrote a check (#70933) in the amount of $9,085.00 using a check drawn on J&P's United Bank account, payable to First Citizens Bank (i.e., for the Payment of a mortgage loan on real estate property owned that year by 32 Sand Dollar LLC, of which Jeff is the Sole Proprietor). In keeping with his usual and standard business practices, he caused that check to be delivered to the named "Payee" by depositing it in the mail on the same day he wrote the check. He 'coded' the transaction in J&P's online QuickBooks® software program as a J&P "Purchase/Resale" expense and thereafter deducted it on J&P's 2020 corporate tax return. He failed to report the transaction on his 2020 personal income tax return as 'income' received, however, he did report the mortgage interest paid that year as a deduction for expenses on 32 Sand Dollar LLC, on his personal 2020 tax return.

      (2)    On March 3, 2016, Jeff Greene wrote a check (#60990) in the amount of $47,860.70 using a check drawn on J&P's United Bank account, payable to Oconee Federal Savings and Loan (i.e., for the final Payment of a mortgage loan on real estate property at 144 River Point owned by Jeff and Sally Greene, however, the loan was in the name of Lamar and Julie Greene). In keeping with his usual and standard business practices, he caused that check to be delivered to the named "Payee" by depositing it in the mail on the same day he wrote the check. He 'coded' the transaction in J&P's online QuickBooks® software program as a J&P "Rent"

expense and thereafter deducted it on J&P's 2016 corporate tax return. He failed to report the transaction on his 2016 personal income tax return as 'income' received.

B.  **Payments to/for the benefit of Defendant Sally Greene:**

(1)    On December 13, 2016, Jeff Greene wrote a check (#62857) in the amount of $4,764.02, and on  April 6, 2017, Jeff Greene wrote a check (#63593) in the amount of $6,068.31,  using checks drawn on J&P's United Bank account, payable to Holden Beach Vacations, reservation #157330, (i.e., for the payment of a vacation rental (in total, $10,832.33) during the 2017 annual Matthews' family vacation). In keeping with his usual and standard business practices, he caused those checks to be delivered to the named "Payee" by depositing it in the mail on the same day he wrote the checks. He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Rent" expense and thereafter deducted it on J&P's 2016 and 2017 corporate tax returns. Sally Matthews Greene knowingly accepted the benefits of the payment but did not report the transaction on their 2016 nor 2017 personal income tax return as a "gift" or "income" received.

(2)    On June 4, 2020, Jeff Greene wrote a check (#70401) in the amount of $3,600.00, using a check drawn on J&P's United Bank account, payable to Sally M. Greene, via American Funds (i.e., for an extra deposit into Sally's Capital Bank & Trust Simple IRA Account, the payment disguised as Employers Match 401K). In keeping with his usual and standard business practices, he caused those checks to be delivered to the named "Payee" by depositing it in the mail on the same day he wrote the checks. He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Employers Match 401k" expense and thereafter

deducted it on J&P's 2020 corporate tax returns. Sally Matthews Greene knowingly accepted the benefits of the payment but did not report the transaction on their 2020 personal income tax return as a "gift", instead reporting the transaction as income earned (while Sally, a Licensed Dental Hygienist, did not perform work as an employee for J&P, but was paid as if she were a salaried salesman employee).

(3)　　On March 27, 2021 Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $5,000.00 from J&P's United Bank account, payable to Bank of America (i.e., for a personal credit card purchase at O'darby's Wine & Spirit on March 1, 2021 in the amount of $202.68, and other Greene family personal expenses). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Purchase/Resale" expense and thereafter deducted it on J&P's 2021 corporate tax return. Sally Matthews Greene knowingly accepted the benefits of the payment but did not report the transaction on their 2021 personal income tax return as a "gift" or "income" received.

(4)　　On September 2, 2021, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $1,200.00 from J&P's United Bank account, payable to Sally M. Greene (i.e., for a $ 1,108.20 deposit into Sally's Capital Bank & Trust Simple IRA Account, $74.40 paid to Social Security on Sally's behalf, and $17.40 paid to Medicare on Sally's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2021 corporate tax return. Sally Matthews Greene knowingly accepted the benefits of the payment but did not report the transaction on their 2021 personal income tax return as a "gift", instead

reporting the transaction as income earned (while Sally, a Licensed Dental Hygienist, did not perform work as an employee for J&P, but was paid as if she were a salaried employee).

C. **Payments to/for the benefit of Defendant Harrison Greene:**

(1)     On February 4, 2016, Jeff Greene wrote a check (#60664) in the amount of $3,130.65 using a check drawn on J&P's United Bank account, payable to Harrison Greene (i.e., for the payment of Harrison Greene's Rent). In keeping with his usual and standard business practices, he caused that check to be delivered to the named "Payee" by depositing it in the mail on the same day he wrote the check. He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Rent" expense and thereafter deducted it on J&P's 2016 corporate tax return. Harrison Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2016 personal income tax return as a "gift" or "income" received.

(2)     On September 2, 2021, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $400.00 from J&P's United Bank account, payable to Harrison Greene (i.e., for a $369.40 deposit into Harrison's Simple IRA account, $24.80 paid to Social Security on Harrison's behalf and $5.80 paid to Medicare on Harrison's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2021 corporate tax return.  Harrison Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2021 personal income tax return as a "gift", instead reporting it as income earned (while Harrison was employed full time by Kittrich LLC, not as a J&P Salaried Salesman).

(3)     On July 30, 2020, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $400.00 from J&P's United Bank account, payable to Harrison Greene (i.e., a $369.40 deposit into Harrison's Simple IRA account, $24.80 paid to Social Security on Harrison's behalf and $5.80 paid to Medicare on Harrison's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2020 corporate tax return.  Harrison Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2020 personal income tax return as a "gift", instead reporting it as income earned (while Harrison was employed full time by Claire-Sprayway Inc. and invested in their company IRA, not as a J&P Salaried Salesman).

D.     **Payments to/for the benefit of Defendant Samuel Greene:**

(1)     On December 1, 2021, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $600.00 using a check drawn on J&P's United Bank account, payable to Harbor America Costal for Samuel Greene (i.e., for a $554.10 deposit into Samuel's Simple IRA account, the balance of $45.90 paid to Social Security and Social Security on Samuel's behalf.) He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2021 corporate tax return. Samuel Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2021 personal income tax return as a "gift", instead reporting it as income earned (while Samuel was employed full time by Consolidated Electrical

Distributors and invested in the company's IRA plan, not as a J&P Salaried Salesman).

(2)  On September 2, 2021, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $400.00 from J&P's United Bank account, payable to Samuel Greene (i.e., for a $369.40 deposit into Samuel Simple IRA account, $24.80 paid to Social Security on Samuel's behalf and $5.80 paid to Medicare on Samuel's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2021 corporate tax return. Samuel Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2021 personal income tax return as a "gift", instead reporting it as income earned (while Samuel was employed full time by Consolidated Electrical Distributors and invested in the company's IRA plan, not as a J&P Salaried Salesman).

(3)  On July 30, 2020, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $400.00 from J&P's United Bank account, payable to Samuel Greene (i.e., a $369.40 deposit into Samuel's Simple IRA account, $24.80 paid to Social Security on Samuel's behalf and $5.80 paid to Medicare on Samuel's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2020 corporate tax return. Samuel Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2020 personal income tax return as a "gift", instead reporting it as income earned (while

Samuel was employed full time by Consolidated Electrical Distributors and invested in the company's IRA plan, not as a J&P Salaried Salesman).

E. **Payments to/for the benefit of Defendant Simeon Greene**:

(1)    On January 24, 2019, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $6,824.22 from J&P's United Bank, payable to Bank of America (i.e., for a January 2, 2019 personal credit card purchase for Simeon's American Airline ticket for January 6, 2019 travel in the amount of $1,465.99, and other Greene family expenses).   He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Travel and Purchase/Resale " expense and thereafter deducted it on J&P's 2019 corporate tax return.  Sally and Jeff Greene knowingly accepted the benefits of Simeon Greene's payment but did not report the transaction on their 2019 personal income tax return as a "gift" or "income" received, while filing for Simeon as a dependent.

(2)    On September 2, 2021, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $400.00 from J&P's United Bank account, payable to Simeon Greene (i.e., for a $369.40 deposit into Simeon's Simple IRA account, $24.80 paid to Social Security on Simeon's behalf and $5.80 paid to Medicare on Simeon's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2021 corporate tax return.   Simeon Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2021 personal income tax return as a "gift", instead reporting it as income earned (while

Simeon was employed full time with Mohawk ESV, Inc., not a J&P Salaried Salesman).

(3)    On July 30, 2020, Jeff Greene made a payment through an electronic funds transfer ("EFT") in the amount of $400.00 from J&P's United Bank account, payable to Simeon Greene (i.e., a $369.40 deposit into Simeon's Simple IRA account, $24.80 paid to Social Security on Simeon's behalf and $5.80 paid to Medicare on Simeon's behalf). He 'coded' the transaction in J&P's online Quickbooks® software program as a J&P "Payroll" expense and thereafter deducted it on J&P's 2020 corporate tax return. Simeon Greene knowingly accepted the benefits of the payment but did not report the transaction on his 2020 personal income tax return as a "gift", instead reporting it as income earned (while Simeon was a full-time college student, not a J&P Salaried Salesman).

254.    As a regular pattern and/or practice of using J&P's funds to pay for the personal living expenses, bills, educational expenses, entertainment expenses, travel expenses, gifts, investments, real estate properties, and personal services used, provided to or acquired by the Jeffery Greene family members (i.e., on a routine and almost daily basis from January 23, 2009 to the present) RICO Defendant Jeffery Greene routinely and knowingly conducted financial transactions using J&P's monies with the intent to engage in conduct in violations of 18 U.S. Code §§ 1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

255.    RICO Defendant Jeffery Greene knew that it was unlawful for him to take steps (a) to actively conceal taxable income and/or the taxable income received by each member of the Jeffery Greene family, (b) to misrepresent the personal expenditures for each member of the Jeffery

Greene family as tax deductible expenses or deductions of J&P, (c) to conceal his own taxable income, and/or (d) to otherwise falsely reduce J&P's tax liability (i.e., by claiming false and illegitimate deductions on J&P's tax returns) constituted an "unlawful activity" under 18 U.S. Code §§ 1956 and 1957.

256.    RICO Defendant Jeffery Greene also knew that the monies involved in each of the financial transactions, once embezzled and/or converted, represented the proceeds of an "unlawful activity" within the meaning of 18 U.S. Code § 1956 and, with that actual knowledge, intentionally engaged in conduct with respect to the handling of those financial transactions to commit violations of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements).

257.    Every member of the Jeffery Greene family knowing received and accepted each of the above-described payments, benefits, goods and services, with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986, and in violation of 18 U.S.C. 1956(a)(1)(A)(ii).

258.    J&P and Plaintiff have each sustained damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

259.    The pattern of racketeering Jeffery Greene followed in defrauding his mother, Margie Greene and his stepmother, Juleene Greene, described above, was followed in this scheme.

260.    First, Jeffery Greene caused J&P to enter a series of fraudulent and unlawful transactions, for his own, personal enrichment and benefit (and the benefit of RICO Defendant Sally Greene), using monies embezzled and/or converted from J&P in breach of his fiduciary duties to both Plaintiff and J&P. This has happened dozens of times per week (or more) for every week since January 23, 2009…. the actual number of separate fraudulent transactions totals into the *thousands*.

261. The typical pattern or practice of this fraudulent scheme is described as follows:

    a. Operating from a position of special trust as J&P's sole Director, officer, "controlling shareholder" and Operating Manager, Jeffery Greene embezzled and converted J&P's monies for his own personal use, enjoyment, benefit and enrichment by issuing a check and/or initiating an electronic funds transfer (EFT) to one of his personal vendors (and/or the personal vendors for his family members),

    b. Jeffery Greene then used the mails (in violation of 18 U.S. Code §1341, mail fraud) and/or the use of wires (in violation of 18 U.S. Code §1343, wire fraud) to deliver said payments (i.e., advancing the goals and purposes of the RICO Enterprise), each time committing a separate "predicate act" (i.e., in violation of 18 U.S. Code §1962(c),

    c. Jeffery Greene and/or others operating under his direct supervision, control or authority, then *falsely* 'coded' or recorded each of the above-listed payments or transactions using one or more of J&P's tax deductible expense categories, in violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax), 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements), 18 U.S. Code §1962(c), (RICO-racketeering) and 18 U.S. Code §1962(d) (Conspiracy to commit a violation of 18 U.S. Code §1962(c), and, finally,

    d. Each of Jeffery Greene's uses/expenditures of J&P's funds (i.e., to falsely characterize each such expenditure as a tax-deductible operating expense of J&P) constituted a violation of §§1956 and 1957 (i.e., money laundering to avoid taxation),

e. J&P's *sworn* tax returns for each of the tax years in which transaction(s) occurred confirm that each such payment was, in fact, fraudulently claimed as a tax-deductible expense of J&P, and thereby reduced J&P's taxes.

f. Further, because each of the above-described transactions also involved the payment of "income" to Jeffery and Sally Greene, they each had a legal duty to report such income on their individual tax returns for each year in which said payments/benefits were received, but (apparently without exception) they failed to do so.

g. Therefore, each transaction described in subparts e. and f., from January 23, 2009 to the present constitutes a direct violation of 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements), and a separate "predicate act" under 18 U.S. Code §1962(c).

## The Second J&P Enterprises Scheme—i.e., The Property Acquisition Scheme

262.    Plaintiff *conservatively* estimates that the total number of transactions amounts to more than 10,000 transactions, involving a total of approximately $30,000,000 to $35,000,000 of J&P's monies/revenues over that same period.

263.    Based on good faith and the information received, Plaintiff believes that the actual scope of the "Property Acquisition Scheme" is *significantly* larger than the combined scope of the other specific schemes previously stated herein.

264.    Since January 23, 2009, RICO Defendants Jeffery and Sally Greene have embezzled, converted and used J&P's monies to acquire, maintain, repair, support and operate the following specific real, personal and mixed property interests:

A. Real Property

    1. 1699 Hunting Court, Rock Hill, S.C.  (York County, S.C.)

    2. 144 River Point, Clemson, S.C. (Pickens County, S.C.)

    3. 118 Elm Street, Clemson, S.C. (Pickens County, S.C.)

    4. 1947 Franklin St.., Rock Hill, S.C. (York County, S.C.)

    5. 1056 Cherokee Ave, Rock Hill, S.C. (York County, S.C.)

    6. 1125 Cherokee Ave, Rock Hill, S.C. (York County, S.C.)

    7. 824 Patton St., Rock Hill, S.C. (York County, S.C.)

    8. Eden Terrace, Rock Hill, S.C. (York County, S.C.)

    9. 107 Hillcrest Ave. Units 1 thru 6, Rock Hill, S.C. (i.e., 6 rental units) (York County, S.C.)

    10. 37 South Forest Beach Drive #18 HHBV, (Beaufort County, S.C.)

    11. 32 Sand Dollar Rd, Hilton Head Island, S.C. (Beaufort County, S.C.)

B. Personal Property/Vehicles/Watercraft:

    1. 2015 Audi A6 4s

    2. 2020 Ford F150 PK

    3. 2010 Nissan Altima 4S

    4. 2014 Nissan Altima vin AT2MT

    5. 2012 Volvo XC60 vin 952DL

    6. 2006 Infiniti M35 4S

    7. 2015 Infiniti AZAZ2NF

    8. 2016 Infiniti QX80 AZ2NF

    9. 2001 Chevrolet C16N

10. 2001 Ford F17

11. 2008 Ford F122

12. 2020 Ford F150 Super crew Pickup

13. 2018 Jeep S4G

14. 2014 Sea Hunt Gamefish Watercraft

15. 2015 Mercury ME15MH Watercraft Motor

16. 2014 Yamaha F40LA Watercraft Motor

17. 2014 Yamaha LF150X MAD0015011 Motor

18. 2014 Yamaha F150XA MAD0015010 Motor

19. 2012 Yamaha F20LEH Watercraft Motor

20. 1996 Monterey 20 ft Watercraft RGFP0303K596 210 BR

21. 2005 Watercraft (tax receipt 003117-22-7)

22. 2005 Watercraft (tax receipt 007843-22-7)

23. 2007 Bryant 206 Watercraft

24. 2008 Sea Hunt Watercraft 1066DA WAD000061

25. 2004 Kawasaki Jet Ski

C.    Financial Accounts/Other

265.    It has not yet been possible to provide a full or complete list, which is expected to include *a comprehensive* chart of fraudulent transactions for the J&P Enterprises Scheme, but efforts are underway and same will be provided to the Court by way of an Amendment or a Supplement to this Complain upon completion.

266.    For illustration purposes only, Plaintiff has prepared a detailed summary chart of transactions to establish that Defendant Jeffery and Sally Greene has used J&P monies to pay for

all (or the vast proportion of) their personal expenses, purchases, investments, properties, etc. and each one of the properties listed in Paragraph 265, above, as **Summary Chart 4,** [47] attached hereto and incorporated herein by reference for all purposes, the same as if specifically set forth at length, *verbatim*.

267.    J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

# Jeffery Greene's Use of J&P Enterprises of the Carolinas, Inc. as his *Alter Ego*

268.    From the time Jeffery Greene took control of J&P's fiscal operations, on January 23, 2009, (and continuing through to the present), he treated J&P as his alter ego and has J&P's monies for the personal enrichment of himself, his wife Sally and his three (3) adult sons, RICO Defendants Harrison Greene, Samuel Carter Greene and Simeon Ross Greene.

269.    Under Jeffery's leadership, J&P has never held any stockholder's meetings, never held any director's meetings, completely failed to maintain J&P's corporate records (which do not actually exist).[48]

---

[47] Unlike the other summaries, provided with this Complaint, this chart is only a *representative* chart including one example per listed property (unless otherwise denoted by an asterisk (*))

[48] Neither Jeffery nor Paul Baynard, J&P's corporate attorney, have ever followed through with the commitments they made to the US Bankruptcy Court in J&P's Plan of Reorganization. The Articles of Incorporation were never amended (as promised), and the only Articles in existence are the Articles predating J&P's bankruptcy.

270.   No official "corporate" actions have ever been taken by J&P other than one recent *failed* attempt by Plaintiff.[49]

271.   Jeffery has never taken any steps to amend or update any of J&P's corporate governance documents (i.e., J&P's Articles of Incorporation, Bylaws, etc.), though he has filed an annual report (1) falsely representing the actual number of authorized shares for the company and (2) falsely representing himself to be J&P's "President".

272.   Finally, since Jeffery assumed complete control of J&P on January 23, 2009, there have never been any distributions of company profits or dividends to any person *other than* to RICO Defendants Jeff Greene, Sally Greene, Harrison Greene, Samuel Carter Greene, and Simeon Ross Greene, despite Plaintiff Paula Painter's status as a 24% shareholder and the status of Estate of Lamar Greene, which still holds an undivided marital property ownership interest in fifty-two percent (52) marital property shares, which Lamar and Margie owned together.

273.   It should also be noted that Attorney Paul Baynard (and his firm Offit Kurman) have also received more than $82,000 in payments (i.e., according to the financial records of J&P) between January 1, 2021 and September 20, 2023, alone. Mr. Baynard has refused to provide any itemized records or invoices to substantiate any work performed for the company during that same time.

---

[49] On August 22, 2024, Plaintiff persuaded Dan Hunt, the Personal Representative of Lamar Greene's Estate, to act by Consent of a Majority of J&P's shareholders, as authorized by N.G.C.S §55-7-04. (**See Tab 2**). Under that Consent, Jeffery Greene was removed as J&P's Director and Paula Greene Painter was appointed in Jeffery Greene's place. Her expressed intention was to hire a forensic accountant, through the company, to perform a complete forensic audit and analysis of J&P's fiscal operations under Jeffery Greene's tenure as it's supposed *sole and exclusive* Director, Manager, etc. However, Dan Hunt completely reversed his action when he learned that his long-time friend, Attorney Douglas Patrick, had been hired to represent Jeffery in the probate case. Mr. Hunt then signed *another* Consent removing Paula Painter and re-appointing Jeffery Greene as J&P's sole Director. (**See Tab 12**).

274.    It should also be noted (but will be fully addressed below) that Lamar Greene's Estate has

been open since January 2010, and under Dan Hunt's tenure as Personal Representative of the

Estate, since 2012, and that Dan Hunt has (by his conduct) aided and abetted Jeffery Greene's

efforts to avoid accountability for his actions as the controller of J&P.

275.    Each of the schemes perpetrated by RICO Defendants listed, described and summarized

above constituted (1) a "plan or scheme to defraud", (2) evidence an intent to defraud; and (3)

involve[d] a reasonable certainty that the mail or wires were/ used in the furtherance of each

scheme, and each such transaction constitutes a separate but related and ongoing practice of "mail

fraud" or "wire fraud" as "predicate acts" within the meaning of 18 U.S.C. 1962(c).

# Federal Claims

## Count 1: (Against all Defendants)

### RICO 18 U.S.C. § 1962(c)-- Conducting and Participating in the Affairs of An Enterprise Through a Common Pattern of Racketeering Activity based upon the predicate acts of embezzlement, 18 U.S. Code §1341 (mail fraud),  18 U.S. Code §1343 (wire fraud), 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements), as Predicate Acts

276.    Paragraphs 1 through 276 are re-alleged, adopted and incorporated herein by reference for

all purposes, the same as if specifically set forth at length herein, *verbatim*.

277.    The relevant period for the pattern of racketeering by Defendants Jeffery Greene, Sally

Greene, Harrison Greene, Samuel Greene, Simeon Greene and Brenda Pressley stems from

January 23, 2009 through the present and possibly earlier, but at this point in discovery is as yet

unknown and continues to the present filing of this RICO Complaint.

278.    At all relevant times, Defendants Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene, Simeon Greene and Brenda Pressley have been RICO Person(s) ("RICO Persons") within the meaning of 18 U.S.C. §§ 1961(3) and §1962(c).

## The RICO Enterprise

279.    The RICO Persons have used an association-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4), to carry out the pattern of racketeering activity. This enterprise consists of the RICO Persons and J&P Enterprises of the Carolinas, Inc. (i.e., through its alter ego use and exploitation by Jeffery Greene). This enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and an ongoing relationship amongst the RICO Persons and J&P Enterprises of the Carolinas, Inc., with sufficient longevity to permit and enable pursuit of the enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate commerce.

280.    This enterprise exists separate and apart from the RICO Persons' pattern of racketeering activity since each of the RICO Persons and J&P Enterprises of the Carolinas, Inc. have multiple goals, not all of which are fraudulent or illegal.

281.    The lawful activity engaged in by The Jeffery Greene Family (i.e., which consists of Jeffery, Sally, Harrison, Samuel and Simeon Greene) includes functioning as a regular family. Brenda Pressley is a Certified Public Accountant and has a tax preparation accounting firm representing many clients, including both individuals and small businesses. J&P Enterprises of the Carolinas, Inc. is a legitimate business which sells parts and services to the textile manufacturing industry and pursues other interests engaged in interstate commerce. However, since at least January 23, 2009, the RICO Persons have used and exploited the resources of J&P Enterprises of the Carolinas, Inc.  as part of their Enterprise to conduct acts of conversion, embezzlement, money

laundering, tax fraud and tax preparation fraud, which each constitute "predicate acts" in violation of 18 U.S.C. §1962(c).

282. At all relevant times, the Defendants and other conspirators associated with this enterprise conducted and participated, directly or indirectly, in the conduct of the enterprise affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(e).

283. Specifically, at all relevant times, Defendant and other conspiring Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above against J&P, Plaintiff, and the Internal Revenue Service, all with the express purpose of advancing the goals and objectives of the Enterprise—specifically, the personal enrichment of each member of the Jeffery Greene Family and other associated RICO Persons.

284. In each of the above-described schemes, the respective RICO Defendants each knowingly participated in a pattern of racketeering within an Enterprise affecting interstate commerce in violation of 18 U.S. Code §1962(c), as follows:

a. Jeffery Greene, acting completely without any oversight or accountability as the sole Operating Officer, Manager, sole Director and "controlling" minority shareholder of J&P, a closely held corporation), initiated, masterminded, directed and controlled each of the racketeering schemes described above.

b. In each scheme arising from Jeffery Greene's *alter ego* operation(s) of J&P, Jeffery Greene knowingly embezzled and converted the money he used to affect the each above specified and listed transactions from the revenues of J&P.

c.      Plaintiff contends, on the basis of good faith and information received, that Jeffery Greene knowingly used a fictitious (i.e., non-existing) corporate name of "J&P Enterprises, Inc." drawn from J&P's bank accounts as one part of a multi-part money laundering plan, to conceal and hide the origin or ownership of the funds which were paid to (or for the benefit of) Jeffery Greene and the other Jeffery Greene family members, in violation of 18 U.S. Code §1956.

d.      Jeffery knew the money he converted and/or embezzled from J&P represented the proceeds of an unlawful activity at the time he initiated each transaction.

e.      As Jeffery initiated and completed each check or electronic funds transfer ("EFT"), he falsely 'coded' (or classified) each such payment in J&P's Quickbooks® *online* financial tax/accounting software program as a tax-deductible business expense of J&P, rather than as (a) payment(s) and/or distribution(s) of valuable benefits, compensation (or taxable income) to himself and/or each member of his immediate family (i.e., RICO Defendants Sally Greene, Harrison Greene, Samuel Greene and Simeon Greene), in furtherance of his scheme to commit tax fraud (both as to J&P's tax return and as to the tax returns for each member of the Jeffery Greene family. In so doing, Jeffery Greene was laying the groundwork for tax fraud and false tax return filings (i.e., in violation of 26 U.S.C. §7201 and 26 U.S.C. §7206 by J&P) and each member of Jeffery Greene's family knowingly joined in that fraudulent tax scheme.

f.      Sally Greene knowingly participated, as part of a racketeering "enterprise," and in furtherance of the goals and objectives of that enterprise, by accepting the benefits of the Jeffery Greene's fraudulent transactions with full knowledge of the unlawful origin of each such payment, the misleading and fraudulent bookkeeping practices by which Jeffery Greene caused each such payment to be issued *through the company*.

78

g.      Sally Greene also knowingly participated as an equal co-actor, as part of a racketeering "enterprise," by (1) using J&P's financial funds to expend J&P's ("laundered") money for many (if not most) of her daily purchases of food, clothing, entertainment, goods, services, travel, gifts, household goods, and a host of other expenditures, and (2) by knowingly and falsely filing 15+ years of fraudulent tax returns (i.e., without reporting any of the above as "income" received --all in violation of 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206, and 18 U.S. Code §1962(c).

h.      Sally Greene also knowingly participated as an equal co-actor, as part of a racketeering "enterprise," by using J&P's financial funds to acquire, maintain and/or repair real estate properties, vehicles, and watercraft—and by agreeing to hold the title to such properties in her own name (together with Jeffery Greene) as "owner." She thereby knowingly participated in violations of 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206, all in violation of 18 U.S. Code §1962(c).

i.      Harrison Greene, Samuel Greene and Simeon Greene each knowingly participated in racketeering activity, as part of a racketeering "enterprise," by accepting compensation and employee benefits from Jeffery Greene, including participation in J&P's employer-matched Simple IRA program even though they (individually and collectively) were not actually employed by J&P, and

j.      Harrison Greene, Samuel Greene and Simeon Greene each knowingly participated in racketeering activity, as part of a racketeering "enterprise," by accepting J&P's financial funds for food, clothing, entertainment, goods, services, travel, gifts, household goods, educational expenses, golf privileges, football tickets, and a host of other expenditures—all while knowing

that said expenditures had been made *through J&P as supposed tax deductible expenditures* and without reporting said payments as either 'gifts' or income, as required,

k.      Harrison Greene, Samuel Greene and Simeon Greene each knowingly participated in racketeering activity, as part of a racketeering "enterprise," by knowingly and falsely filing multiple years of fraudulent tax returns (i.e., without reporting any of the above as "income" received --all in violation of 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat tax) and 26 U.S.C. §7206, and 18 U.S. Code §1962(c).

l.      Brenda Pressley knowingly participated in racketeering activity, as part of a racketeering "enterprise," in furtherance of the goals and objectives of the Enterprise, by preparing and filing fraudulent tax returns for J&P for *at least* 15+ years, and by assisting Jeffery Greene in the fraudulent 'coding' and/or classification of J&P's expenditures and the inclusion of those falsely coded transactions on J&P's federal tax returns for *at least* 15+ years.

m.      Brenda Pressley knowingly participated in racketeering activity, as part of a racketeering "enterprise," in furtherance of the goals and objectives of the Enterprise, by assisting Jeffery Greene in furtherance of his money laundering scheme—particularly in the confirming and/or facilitating Jeffery Greene's use of a fictitious (i.e., non-existent) and/or fraudulent corporate entity "J&P Enterprises, Inc." checks to pay the obligations of J&P Enterprises of the Carolinas, Inc.

n.      At all relevant times, RICO Defendants Brenda Pressley and Jeffery Greene regularly interacted and communicated about the coding various J&P expenditures (i.e., through the "Enterprise" *online* version of Quickbooks®), to characterize J&P's expenses as tax deductible expenses wherever possible.  The online version of Quickbooks® features an interactive "audit" file which reflects edits, reclassifications or re-coding and identifies the person(s) making such changes to J&P's financial records.  Brenda Pressley had an intimate knowledge of J&P's

operations based upon her *long* tenure as J&P's CPA and tax return preparer. Brenda Pressley knew that J&P's legitimate expenses were *far* less in each category than reflected on the tax return schedules submitted with J&P's returns—every year—for each year during Jeffery's 15-year tenure as J&P's sole manager.

o.      The accounting and tax preparation services provided by Brenda Pressley went *far* beyond the legitimate and legal services of a CPA who assists in the preparation and filing of tax returns for a business like J&P. Brenda Pressley knowingly participated in racketeering activities, as part of a racketeering "enterprise," in furtherance of the goals and objectives of the Enterprise.

p.      RICO Defendant Dan Hunt has knowingly participated in racketeering activities, as part of a racketeering "enterprise," in furtherance of the goals and objectives of the Enterprise, by actively engaging in efforts to hide, cover up and/or conceal his own *extensive* 11+ year record of negligence as the PR of Lamar Greene's Estate,

q.      RICO Defendant Dan Hunt has knowingly participated in racketeering activities, as part of a racketeering "enterprise," in furtherance of the goals and objectives of the Enterprise, by re-appointing Jeffery Greene to serve as J&P's sole Director after having acquired ample evidence of Jeffery Greene's long and established pattern of racketeering activity through the misuse, conversion, embezzlement and money laundering of J&P's financial assets for the benefit of Jeffery Greene and his family personally, to the detriment of J&P and its shareholders and also in direct violation of Jeffery Greene's fiduciary duties to Plaintiff (a minority/powerless shareholder in a closely held-family North Carolina corporation),

r.      RICO Defendant Dan Hunt has knowingly participated in racketeering activities, as part of a racketeering "enterprise," in furtherance of the goals and objectives of the Enterprise by his efforts to *further,* promote and support false and fraudulent statements made by Jeffery Greene's

attorney, Austin Watts, to the Pickens County probate court that "…Lamar's 1992 Last Will and Testament leaves assets to only two devisees: (1) his son Jeffery (hereinafter "Jeff") was left 52 shares of stock in J&P Enterprises of the Carolinas, Inc. (hereafter "J&P); and (2) his widow Juleene Greene was left the remainder of his assets…" when, in fact, Dan Hunt has actual knowledge that such representations are material, false, and misleading *and* Dan Hunt has an affirmative duty to the Pickens County Probate Court to correct such statements on the record. Dan Hunt also has/had actual knowledge that such false statements were made in furtherance of the goals and objectives of an unlawful RICO Enterprise.

285.    The acts of racketeering activity previously described (and those described below), taken together, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1951(5). The acts alleged were related to each other by virtue of common participants, common victims and a common result of fraud and enriching the Defendants and conspirators at Plaintiff's expense while concealing the conspirators' fraudulent activities.

286.    Each predicate act described herein above had the same or similar purpose: the predicate acts involved material misrepresentations, omissions and concealment in a scheme to injure J&P, Plaintiff and, ultimately, J&P's other shareholders and to deprive them of the benefit, use and enjoyment of the total (collective) amount of those transactions—i.e., currently estimated to be more than $30,000,000 in damages to J&P over the entire term of Jeffery Greene's tenure as J&P's financial manager.

287.    To date, J&P and Plaintiff, respectfully, have been damaged in at least the sums of $30,000,000 and $7,500,000, respectively, plus prejudgment interest, attorneys' fees.

288.    The RICO Defendants' money laundering and fraudulent scheme continues and would have remained unknown but for Plaintiff's fortuitous discovery of J&P's complete financial

records for the entire period while the company has been under Jeffery Greene's exclusive financial control.

289.    Plaintiff has recently hired a nationally recognized forensic accountant/investigator who is currently conducting a detailed audit and analysis of all of J&P's financial transactions under Jeffery Greene's management and control.  (Plaintiff shall ask the Court to enter an Order requiring J&P to pay for the forensic investigation *on an interim basis* and, ultimately, to assess such costs/expenses against RICO Defendants in the Court's Final Judgment).

290.    Plaintiff expressly reserves the right to amend her pleadings when a more precise understanding of the damages the Plaintiff's business and property interests becomes known.

## Count 2 (Against all Defendants)

### RICO-18 U.S.C. § 1962(d) (against all Defendants) Conspiring to violate 18 U.S.C. §1962(c).

291.    Paragraphs 1 through 291 are realleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

292.    Each RICO Person knowingly participated in the furtherance of the goals and objectives of the RICO Enterprise described hereinabove.

293.    RICO Defendants Jeffery Greene and Sally Greene knowingly and intentionally masterminded, coordinated, orchestrated, administered,  and otherwise participated in carrying out the RICO Enterprise by their knowing and intentional use of J&P as their *alter ego* (as described above), by and through using J&P's monies for their personal use/enjoyment/enrichment/purposes through the tax fraud-money laundering scheme (described above) and by using the mails and wires as a means of carrying out their racketeering activity, proximately causing damages to (1)

Plaintiff's individual business and property interests, (2) J&P and (3) the United States government (i.e., IRS).

294.     RICO Defendants Harrison Greene, Samuel Greene and Simeon Greene each knowingly and intentionally received, facilitated, cooperated and accepted (both directly and indirectly) the unlawful monetary payments and/or benefits from Jeffery Greene in furtherance of the goals and objectives of the RICO Enterprise.

295.     More specifically, Harrison Greene, Samuel Greene and Simeon Greene each knowingly, intentionally, purposely and fraudulently participated in the RICO Enterprise and in furtherance of its goals and objectives by/through their respective acceptance of J&P's embezzled and converted funds, for their personal use, enjoyment, enrichment, and/or other purposes through the tax fraud/money laundering scheme (described above) and also by using the mails and wires as a means of carrying out their respective racketeering activity(ies).

296.     The full nature and extent of involvement/participation by Defendants Harrison Greene, Samuel Greene and Simeon Greene in the Enterprise has not been fully discovered at this point, but based upon the facts Plaintiff has been able to discover at this time, Plaintiff alleges that said Defendants each accepted the benefits of J&P's embezzled and converted funds, for their personal use, enjoyment, enrichment, and/or other goals and purposes of the RICO Enterprise.

297.     Each of the RICO Defendants knowingly agreed to facilitate the operation of the above-described RICO Enterprise through a pattern of racketeering activity.

298.     Jeffery Greene and Sally Greene each knowingly and intentionally conspired and agreed to participate in the pattern of racketeering activities specifically described in  directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity,

and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

299.    The RICO Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

300.    That conduct constitutes a conspiracy in violation of 18 U.S.C. § 1962(d), to commit a violation of 18 U.S.C. § 1962(c) for each transaction.  The total estimated number of "racketeering acts" in violation of 18 U.S.C. § 1962(c) has not yet been determined with reasonable certainty but is believed to be a number more than 10,000.

301.    Plaintiff is informed and believes, and based on such information and belief, alleges that each participating member of the  RICO "Enterprise" knew, understood, and intended to (a) participate in the pattern of racketeering activities specifically described above, (b) to violate federal law through the commission of predicate acts in furtherance of the goals and purposes of the RICO Enterprise, (c) and to defraud J&P, its shareholders and the United States Internal Revenue Service.

302.    Each of the RICO Defendants did knowingly aid and abet Jeffery Greene's Scheme to use J&P as his *alter ego* and as an instrumentality for the accomplishment of the goals and purposes of the RICO Enterprise through a pattern of racketeering, including conversion/embezzlement, mail fraud, wire fraud, money laundering and tax-related fraud, in violation of RICO, 18 U.S.C. §1962(c).

303.    Each RICO Defendant did then commit *multiple* overt act(s) in furtherance of the agreement, by knowingly receiving (and retaining) the benefit(s) of Jeffery Greene's wrongful J&P-distributions,  and by knowingly participating in the Enterprise's scheme to violate 18 U.S. Code §§1956 and 1957 (i.e., money laundering), 26 U.S.C. §7201 (i.e., attempt to evade or defeat

tax) and 26 U.S.C. §7206 (intent to commit tax fraud or to prepare and submit false tax statements)…each of which constitutes a "predicate act" under 18 U.S.C. §1962(c).

304.    Finally, each RICO Defendant knowingly agreed that one or more RICO Defendants (including themselves, respectively) and/or other conspirator(s) would commit a violation of 18 U.S.C. § 1962(c).

305.    J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.   More specifically, to date, J&P and Plaintiff, respectfully, have been damaged in at least the sums of $30,000,000 and $7,500,000, respectively, plus prejudgment interest, attorneys' fees.

306.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three-fold their respective damages, plus costs and attorneys' fees from the Defendants.

# Count 3 (Against Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene and Simeon Greene)

## 18 U.S.C. § 1962(a) – Acquiring an Interest in an Enterprise with Racketeering Income

279.    Paragraphs 1 through 276 are re-alleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

280.    Each RICO Defendant derived income and/or valuable benefits and rights, directly or indirectly, from the above-described a pattern of racketeering activity in which such person has participated as a principal, in violation of 18 U.S.C. § 1962(a).

307. Each RICO Defendant used or invested, directly or indirectly, part of that income, or the proceeds of that income, in the operation of the Enterprise.

308. The full extent of RICO Defendants' use of funds derived from racketeering activities is unknown (at the time of the filing of this Complaint); However, Plaintiff would show that Defendants have directly used such racketeering-derived funds to purchase, maintain, repair, service, improve, and/or otherwise directly benefit every property identified in Paragraph 242, supra.

309. J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities. More specifically, to date, J&P and Plaintiff, respectfully, have been damaged in at least the sums of $30,000,000 and $7,500,000, respectively, plus prejudgment interest, attorneys' fees.

310. Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three-fold their respective damages, plus costs and attorneys' fees from the Defendants.

# Count 4 (Against Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene and Simeon Greene)

## 18 U.S.C. § 1962(b) – Acquiring an Interest in an Enterprise Through Racketeering Activity

281. Paragraphs 1 through 276 are re-alleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

282. Each RICO Defendant acquired or maintained, directly or indirectly, an interest in the Enterprise through a pattern of racketeering activity.

283. Plaintiff is informed and believes, and based on such information and belief, alleges that each of the RICO Defendants knew, understood, and intended to participate in the pattern of racketeering activities specifically described above.

284. Plaintiff is informed and believes, and based on such information and belief, alleges that each of the RICO Defendants committed overt act(s) in furtherance of the agreement, and each time they respectively received the benefit of J&P distribution, money, and/or other benefits, they knew they were receiving the money, benefits, privileges from the proceeds of Jeffery Greene's unlawful activity(ies), described above.

285. Plaintiff is informed and believes, and based on such information and belief, alleges that each of the RICO Defendants *knowingly* received the money, benefits, privileges from the proceeds of Jeffery Greene's unlawful activity(ies) with the intent to promote the carrying on of specified unlawful activity under 18 U.S.C. §§1956 and 1957 and/or with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986.

311. J&P and Plaintiff have each, respectively, sustained damages, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

312. J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

313. More specifically, to date, J&P and Plaintiff, respectfully, have been damaged in at least the sums of $30,000,000 and $7,500,000, respectively, plus prejudgment interest, attorneys' fees.

314. Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three-fold their respective damages, plus costs and attorneys' fees from the Defendants.

# State Law Claims

# Count 5: RICO (North Carolina) Chapter 75D-4(a)(2) - Conducting or participating in, directly or indirectly, any enterprise through a pattern of racketeering activity

315.    Paragraphs 1 through 276 are realleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

316.    Each of the RICO Defendants have knowingly engaged in an interrelated pattern of organized unlawful activity, the purpose or effect of which is to derive pecuniary gain.

317.    The RICO Defendants, together, constitute a Racketeering "Enterprise", as defined by N.C.G.S. § 75D-3(1).

318.    Each of the RICO Defendants have knowingly engaged in a "Pattern of racketeering activity", as defined by N.C.G.S. § 75D-3(1), and as specifically described in this Complaint.

319.    Each RICO Defendant has knowingly, and in violation of N.C.G.S. § 75D-4, *et seq.*

      a.   Engaged in a pattern of racketeering activity or, through a pattern of racketeering activities or through proceeds derived therefrom, acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money; or

      b.   Conducted or participated in, directly or indirectly, an Enterprise through a pattern of racketeering activity whether indirectly, or employed by or associated with such enterprise; and

      c.   Conspired with other RICO Defendant(s) or attempted to violate the provisions of N.C.G.S. § 75D-4 (1) and/or (2).

320. Each of the RICO Defendants have realized a direct pecuniary gain and both J&P and Plaintiff (individually), respectively, have realized a direct pecuniary loss as a proximate result of RICO Defendants' respective organized unlawful activity(ies), as hereinabove described.

321. J&P and Plaintiff have each sustained derivative and individual damages, respectively, to their respective business and/or property interests, as a direct and proximate result of Defendants' racketeering activities.

322. More specifically, to date, J&P and Plaintiff, respectfully, have been damaged in at least the sums of $30,000,000 and $7,500,000, respectively, plus prejudgment interest, attorneys' fees.

323. Pursuant to N.C.G.S. § 75D-8, Plaintiff is entitled to recover three-fold their respective damages, plus costs and attorneys' fees from the Defendants.

# Count 6: RICO (North Carolina) Chapter 75D-4(a)(3) - Conspiring with another or attempting to violate any of the provisions of subdivision Chapter 75D-4(a) (1) or (2)

324. Paragraphs 1 through 296 are realleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

325. Each of the RICO Defendants have knowingly engaged in a conspiracy with one (1) or more other RICO Defendants to violate any of the provisions of N.C.G.S. § 75D-4(a)(1) or (2), as described hereinabove and have thereby proximately caused both J&P and Plaintiff, individually, to suffer actual damages, the recovery for which this suit is brought.

326. Plaintiff, acting both derivatively and in her individual capacity, seeks recovery against RICO Defendants in accordance with the provisions of N.C.G.S. § 75D-8, plus all other legal or equitable relief to which she may show J&P and/or herself justly entitled.

# Count 7: RICO (North Carolina) Chapter 75D-4(a)(1) -- Engaging in a pattern of racketeering activity or, through a pattern of racketeering activities or through proceeds derived therefrom, acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money

327.    Paragraphs 1 through 315 are realleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

328.    RICO Defendants Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene and Simeon Greene and Brenda Pressley have each engaged in a pattern of racketeering activity or, through a pattern of racketeering activities or through proceeds derived therefrom, have acquir[ed] or maintain[ed], directly or indirectly, an interest in or control of real property, personal property, and/or money, and have thereby proximately caused both J&P and Plaintiff, individually, to suffer actual damages, the recovery for which this suit is brought.

329.    RICO Defendants Jeffery and Sally Greene have acquired the following (a) real estate properties, (b) personal property and/or (c) corporate entities and/or have otherwise maintained, repaired and improved said properties, in whole or in part, by using the pecuniary gains realized through RICO Defendants' respective organized unlawful activity(ies), as hereinabove described:

Real Properties:

a.    1699 Hunting Court, Rock Hill, S.C.  (York County, S.C.)

b.    144 River Point, Clemson, S.C. (Pickens County, S.C.)

c.    118 Elm Street, Clemson, S.C. (Pickens County, S.C.)

d.    1947 Franklin St.., Rock Hill, S.C. (York County, S.C.)

e.  Catawba Terrace?

f.  1056 Cherokee Ave, Rock Hill, S.C. (York County, S.C.)

g.  1125 Cherokee Ave, Rock Hill, S.C. (York County, S.C.)

h.  824 Patton St., Rock Hill, S.C. (York County, S.C.)

i.  Eden Terrace, Rock Hill, S.C. (York County, S.C.)

j.  107 Hillcrest Ave. Units 1 thru 6, Rock Hill, S.C. (i.e., 6 rental units) (York County, S.C.)

k.  37 South Forest Beach Drive #18 HHBV, (Beaufort County, S.C.)

l.  #18 HHBV, Hilton Head Island, S.C. (Beaufort County, S.C.)

m.  32 Sand Dollar Rd, Hilton Head Island, S.C. (Beaufort County, S.C.)

n.  102 Camelot Dr., Gaffney, SC 29341

o.  5640 Gallagher Dr., Gaston, NC Parcel No. 146270

Personal Property/Vehicles/Watercraft:

ii.  2015 Audi A6 4s

iii.  2020 Ford F150 PK

iv.  2010 Nissan Altima 4S

v.  2014 Nissan Altima vin AT2MT

vi.  2012 Volvo XC60 vin 952DL

vii.  2006 Infiniti M35 4S

viii.  2015 Infiniti AZAZ2NF

ix.  2016 Infiniti QX80 AZ2NF

x.  2001 Chevrolet C16N

xi.  2001 Ford F17

xii.    2008 Ford F122

xiii.    2020 Ford F150 Super crew Pickup

xiv.    2018 Jeep S4G

xv.    2014 Sea Hunt Gamefish Watercraft

xvi.    2015 Mercury ME15MH Watercraft Motor

xvii.    2014 Yamaha F40LA Watercraft Motor

xviii.    2014 Yamaha LF150X MAD0015011 Motor

xix.    2014 Yamaha F150XA MAD0015010 Motor

xx.    2012 Yamaha F20LEH Watercraft Motor

xxi.    1996 Monterey 20 ft Watercraft RGFP0303K596 210 BR

xxii.    2005 Watercraft (tax receipt 003117-22-7)

xxiii.    2005 Watercraft (tax receipt 007843-22-7)

xxiv.    2007 Bryant 206 Watercraft

xxv.    2008 Sea Hunt Watercraft 1066DA WAD000061

xxvi.    2004 Kawasaki Jet Ski

Business and Corporate ownership interests:

xxvii.    J&P Enterprises of the Carolinas, Inc. (NC)

xxviii.    J&P Security, LLC[50]

---

[50] The South Carolina Secretary of State's corporation website indicates that Jeffery Greene was the Registered Agent of an entity called "J&P Security, LLC" (i.e., an entity owned in equal 50% member interests by Jeffery and Lamar)—and *not* J&P Securities, LLC as listed in Dan Hunt's Inventory. J&P Security, LLC was organized on October 10, 2002, and dissolved on August 19, 2010—thereby extinguishing Lamar's ownership interests in that entity. It is noteworthy that Jeffery Greene dissolved this entity 10 full months after Lamar's death and, within 3 months, he opened an another (unincorporated) entity called "JP Services" believed to be engaged in providing the same services, with the same customer base, using the same physical location as J&P Security, LLC.

xxix. "JP Services"

xxx. Palmetto State Enterprises, LLC

xxxi. The Legends of Tuscaloosa, LLC

xxxii. The Legends of Blacksburg, LLC

xxxiii. 32 Sand Dollar, LLC

330. Each member of the Jeffery Greene Family have accumulated substantial balances in their respective Simple IRA account(s) held in the name(s) of any of the following RICO Defendants, to wit: Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene or Simeon Greene, respectively, to the extent said accounts were funded by (and/or include unlawful deposits from) J&P Enterprises of the Carolinas, Inc.

331. Plaintiff, acting both derivatively and in her individual capacity, seeks recovery against RICO Defendants in accordance with the provisions of N.C.G.S. § 75D-8, plus all other legal or equitable relief to which she may show J&P and/or herself justly entitled.

## Count 9-Breach of Fiduciary Duty

332. Paragraphs 1 through 276 are realleged, adopted and incorporated herein by reference for all purposes, the same as if specifically set forth at length herein, *verbatim*.

333. Defendant Jeffery Greene is a "controlling shareholder" under the law(s) of North Carolina. At all relevant times, Defendant Jeffery Greene has been J&P's sole Director, its only Officer and its only manager of operations. Like Plaintiff, Jeffery Greene holds 24% of J&P's shareholder interests.

334. At all relevant times, Defendant Dan Hunt has held control over 52% of J&P's shareholders' interests.

335.    J&P is a closely held "family" corporation under North Carolina law. Defendants Jeffery Greene and Dan Hunt each owed Plaintiff "special" duties (a) *not* to divert J&P's profits and/or opportunities for their own use and benefit and/or to Plaintiff's detriment as a minority shareholder of J&P.

336.    Defendants Dan Hunt and Jeffery Greene each owed Plaintiff (a) "special duty(ies)" of full disclosure, due care, honesty in all communications, and the duty to be fully accountable for any actions that concern and/or effect J&P and/or Plaintiff's minority interests.

337.    Defendants Jeffery Greene and Dan Hunt have also, at all relevant times, each owed both J&P and Plaintiff, respectively, the following fiduciary duties:

a.      The duty to exercise good faith, care and diligence with respect to any actions which affect or relate to the management and/or operations of J&P,

b.      The duty to protect Plaintiff's minority ownership interests, including the duty to ensure that Plaintiff receive(s) her fair share of J&P's income and assets,

c.      The duty *not* to engage in any dealings which prioritize the interests of the fiduciary(ies) over those of the company and/or Plaintiff, individually,

d.      The duty not to take any action(s) that personally benefit themselves to the detriment of J&P's minority shareholders.

e.      The duty not to cause J&P to participate in any transactions that are unlawful, illegal, detrimental to the interests of the company and/or Plaintiff as a minority shareholder,

f.      The duty not to convert or embezzle J&P's monies, assets and/or property,

338.    Defendants Jeffery Greene and Dan Hunt have each breached their respective fiduciary duties to Plaintiff, as described hereinabove.

339.    Defendants have each proximately caused Plaintiff to sustain actual damages in a presently undetermined amount, for which she sues.

## Count 10--Request for Immediate Injunctive Relief, Including the Appointment of a Receiver Pursuant to N.C. Gen. Stat. § 75D-8

286.    Plaintiff Paula Greene Painter (individually) and J&P will suffer irreparable injury in the absence of injunctive relief.  The threatened injury to Paula Greene Painter (individually) and J&P outweighs the harm (if any) to RICO Defendants resulting from the order, and the requested injunction is not averse to public interest.  Finally, there is substantial likelihood that Plaintiff will succeed on the merits, as demonstrated by the allegations in her Verified Complaint, below.

287.    Plaintiff requests equitable relief available to her under N.C.G.S. § 75D-5, *et seq.*  (i.e., a North Carolina Civil RICO forfeiture proceeding) with respect to any/all of the property(ies) identified above in/to which RICO Defendants Jeffery Greene, Sally Greene, Harrison Greene, Samuel Greene and/or Simeon Greene, respectively, have a current ownership interest and/or against any other property(ies) which may be discovered through the course of Plaintiff's continuing investigation and/or through reasonable discovery in this case to the full extent such property(ies) have been acquired by said RICO Defendants through the use of pecuniary gains realized through their respective RICO Defendants' organized unlawful activity(ies), as hereinabove described.

288.    At all relevant times, Plaintiff and J&P Enterprises of the Carolinas, Inc. have been "innocent parties" within the meaning and effect of N.C.G.S. § 75D-8 and are entitled to have her/interests protected by and through the remedies provided thereunder.

289. There is a direct causal nexus between Defendant's pecuniary gain, as required by N.C.G.S. 75D-2(c), and defendant's alleged organized unlawful activity.

290. Each of the RICO Defendants have knowingly engaged in an interrelated pattern of organized unlawful activity, the purpose or effect of which is to derive pecuniary gain to violate any of the provisions of N.C.G.S. § 75D-4(a)(1) or (2), as described hereinabove, and have thereby proximately caused both J&P and Plaintiff, individually, to suffer actual damages.

291. Plaintiff, acting both derivatively and in her individual capacity, seeks equitable relief in accordance with the provisions of N.C.G.S. § 75D-8, plus all other legal or equitable relief to which she may show J&P and/or herself justly entitled.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

1.    For Plaintiff's **First** (Federal) Claim Under RICO 18 U.S.C. § 1962(c):

    a.    An award to J&P non-culpable shareholders for its/their actual damages, in the approximate amount of $30,000,000, then trebled under § 1964(c).

    b.    An award to Plaintiff, individually, in the amount of $7,500,000, then trebled under § 1964(c).

    c.    Prejudgment interest at the highest lawful rate(s) as damages occurred.

    d.    Reasonable attorney's fees, costs of litigation and court costs.

    e.    Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

--

2.    For Plaintiff's **Second** (Federal) Under RICO 18 U.S.C. § 1962(d):

a. An award to J&P non-culpable shareholders for its/their actual damages, in the approximate amount of $30,000,000, then trebled under § 1964(c).

b. An award to Plaintiff, individually, in the amount of $7,500,000, then trebled under § 1964(c).

c. Prejudgment interest at the highest lawful rate(s) as damages occurred.

d. Reasonable attorney's fees, costs of litigation and court costs.

e. Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

--

3. For Plaintiff's **Third** (Federal) Claim Under RICO 18 U.S.C. § 1962(a):

a. An award to J&P non-culpable shareholders for its/their actual damages, in the approximate amount of $30,000,000, then trebled under § 1964(c).

b. An award to Plaintiff, individually, in the amount of $7,500,000, then trebled under § 1964(c).

c. Prejudgment interest at the highest lawful rate(s) as damages occurred.

d. Reasonable attorney's fees, costs of litigation and court costs.

e. Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

--

4. For Plaintiff's **Fourth** (Federal) Claim Under RICO 18 U.S.C. § 1962(b):

a. An award to J&P non-culpable shareholders for its/their actual damages, in the approximate amount of $30,000,000, then trebled under § 1964(c).

b. An award to Plaintiff, individually, in the amount of $7,500,000, then trebled under § 1964(c).

c. Prejudgment interest at the highest lawful rate(s) as damages occurred.

d.  Reasonable attorney's fees, costs of litigation and court costs.

e.  Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

--

5.  For Plaintiff's **Fifth** (State Law) Claim Under N.C.G.S. 75D-4(a)(2) – (i.e., Conducting or participating in, directly or indirectly, any enterprise through a pattern of racketeering activity):

   a.  Actual damages (to J&P) in the amount of $30,000,000, Trebled pursuant to N.C.G.S. 75D-8(c)

   b.  Actual damages (to Plaintiff, individually), in the amount of $7,500,000, Trebled pursuant to N.C.G.S. 75D-8(c)

   c.  Treble Damages, pursuant to N.C.G.S. 75D-8(c)

   d.  Prejudgment interest at the highest lawful rate(s) as damages occurred.

   e.  Reasonable attorney's fees, costs of litigation and court costs.

   f.  An Order pursuant to N.C.G.S. 75D-8(a)(1), for each Defendant to Divest themselves of any interest in J&P Enterprises of the Carolinas, Inc., and all interests in any real and/or personal property, including all funds in any bank account(s), acquired through racketeering activities,

   g.  Attorney's fees and costs

   h.  Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

--

6.  For Plaintiff's **Sixth** (State Law) Claim Under N.C.G.S. 75D-4(a)(1) – (i.e., Conducting or participating in, directly or indirectly, any enterprise through a pattern of racketeering activity):

a. Actual damages (to J&P) in the amount of $30,000,000, Trebled pursuant to N.C.G.S. 75D-8(c)

b. Actual damages (to Plaintiff, individually), in the amount of $7,500,000, Trebled pursuant to N.C.G.S. 75D-8(c)

c. Treble Damages, pursuant to N.C.G.S. 75D-8(c)

d. Prejudgment interest at the highest lawful rate(s) as damages occurred.

e. Reasonable attorney's fees, costs of litigation and court costs.

f. An Order pursuant to N.C.G.S. 75D-8(a)(1), for each Defendant to Divest themselves of any interest in J&P Enterprises of the Carolinas, Inc., and all interests in any real and/or personal property acquired through racketeering activities,

g. Attorney's fees and costs

h. Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

--

7. For Plaintiff's **Seventh** (State Law) Claim Under N.C.G.S. 75D-4(a)(3) - Conspiring with another or attempting to violate any of the provisions of subdivision Chapter 75D-4(a) (1) or (2)-- Engaging in a pattern of racketeering activity or, through a pattern of racketeering activities or through proceeds derived therefrom, acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise, real property, or personal property, including all funds in any bank account(s), of any nature, including money.

a. Actual damages (to J&P) in the amount of $30,000,000, Trebled pursuant to N.C.G.S. 75D-8(c)

b. Actual damages (to Plaintiff, individually), in the amount of $7,500,000, Trebled

pursuant to N.C.G.S. 75D-8(c)

c. Treble Damages, pursuant to N.C.G.S. 75D-8(c)

d. Prejudgment interest at the highest lawful rate(s) as damages occurred.

e. Reasonable attorney's fees, costs of litigation and court costs.

f. An Order pursuant to N.C.G.S. 75D-8(a)(1), for each Defendant to Divest themselves of any interest in J&P Enterprises of the Carolinas, Inc., and all interests in any real and/or personal property acquired through racketeering activities,

g. Attorney's fees and costs

h. Such other relief, in equity or law, to which Plaintiff shows herself justly entitled.

—

8. For Plaintiff's **Eighth** (State Law) Claim:

a. A Judgment against Defendants Dan Hunt and/or Jeffery Greene for the Actual Damages sustained by J&P and Plaintiff, respectively, as a direct and proximate result of said Defendants' respective breaches of fiduciary duty(ies) to J&P and Plaintiff, respectively.

b. Punitive Damages, as permitted and authorized by N.C.G.S. §1D-1, *et seq.*

c. Such other and further relief to which Plaintiff shows herself justly entitled.

This 11th day of November 2024.

Respectfully submitted by:

McAdoo Law Group, PLLC

By:_____
Morris F. McAdoo
112 S. Tryon Street, Ste 570
Charlotte, NC 28284
Mailing Address: P.O. Box 30621
Charlotte, N.C. 28230
Telephone: (888) 235-5550
Facsimile: (704)464-4426
Email:  morris@mcadoolawgroup.com

and

The Law Office of James William ("Bill") Reed

_____
Bill Reed, Appearing *Pro Hac Vice*
(Application Pending)
Georgia Bar #462433
P.O. Box 946
Holly Springs, Georgia 30142
Telephone: 480.227.9911
Email: billreedattorney@gmail.com

102